**THE ALVAREZ FIRM, A Law Corporation**
**DAVID A. SHANEYFELT, State Bar No. 240777**
dshaneyfelt@alvarezfirm.com
**JUSTIN M. ALVAREZ, State Bar No. 223472**
jalvarez@alvarezfirm.com
**PAUL M. DIPIETRO, State Bar No. 287296**
pdipietro@alvarezfirm.com
24005 Ventura Boulevard
Calabasas, California 91302
Tel: (818) 224-7077
Fax: (818) 224-1380

Attorneys for Plaintiffs Jeff Ketelhut and Marcella Ketelhut

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF KETELHUT, an individual, and MARCELLA KETELHUT, an individual, | CASE NO. |
| Plaintiffs, | **COMPLAINT** FOR: |
| v. | 1. Rescission |
| | 2. Fraud |
| KELLY COPELAND, an individual; BARBARA COPELAND, an individual; FATIMA LIFE PLAN, INC., an Arizona corporation; FATIMA PARTNERS INTERNATIONAL, INC. an Arizona limited liability company; VFIP, LLC, an Arizona limited liability company; VILLA FATIMA ORO VALLEY, LLC, an Arizona limited liability company; MARBAR PLAZA, LLC, an Arizona limited liability company; ORO | 3. California Franchise Investment Law Violations |
| | 4. California Securities Fraud |
| | 5. California Broker-Dealer Violations |
| | 6. Section 10b-5 Violations |
| | 7. Unfair Business Practices |
| | 8. Unjust Enrichment |

*The Alvarez Firm, a Law Corp.*
*24005 Ventura Blvd.*
*Calabasas, CA 91302*

VALLEY HOLDINGS, LLC, an Arizona )
limited liability company; BO-KEL )
PROPERTIES, LLC, an Arizona limited )
liability company; COPELAND )
CONSTRUCTION VENTURES LLC, an )
Arizona limited liability company; )
VCL05, LLC, is an Arizona limited )
liability company; SC118119, LLC, an )
Arizona limited liability company; ERIC )
GENUIS, an individual; MICHAEL )
SULLIVAN, an individual; PATRICK )
COPELAND, an individual; JAMIE )
GRIFFITH, an individual; R. MICHAEL )
MOHR, an individual; EDWARD C. )
SLOWIK, an individual; ROBERT A. )
LEON, an individual; and DALE D. )
PELTON, an individual. )
                                          )
                 Defendants.              )
                                          )
_____ )

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

JURISDICTION AND VENUE .................................................................. 2

PARTIES ............................................................................................... 2

    A.    Individual Parties .......................................................... 2

    B.    Corporate Parties ........................................................... 3

    C.    Villa Fatima Affiliate Entities .................................... 4

    D.    Individual Associations With Villa Fatima Entities ......... 5

    E.    Copeland-Affiliate Entities ......................................... 6

ALTER EGO ALLEGATIONS ................................................................. 7

GENERAL ALLEGATIONS .................................................................... 9

    A.    The Ketelhuts' Introduction To Copeland Through Genuis ............. 9

    B.    The Ketelhuts' First Meeting With Copeland ................................. 11

    C.    Copeland's False Representations At The February 14 Meeting ..... 12

    D.    The Fatima Affiliate Entities ......................................................... 16

        1.    Templar ................................................................. 16

        2.    Coraggio ................................................................ 18

        3.    Angela's Café ....................................................... 19

    E.    The Ketelhuts' Investment Proposal .............................................. 22

    F.    The March 7 Conference Call ......................................................... 23

    G.    The March 14 Meeting With Copeland And Sullivan ..................... 24

    H.    The March Note And Developer Agreement ................................... 27

    I.    Copeland's Bait-And-Switch .......................................................... 28

    J.    The April Note ................................................................................ 30

    K.    The Misrepresentations ................................................................... 33

    L.    The Rescission Demand ................................................................... 37

i

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

M.    Copeland's Furtherance Of A Ponzi Scheme ...................................38

FIRST CAUSE OF ACTION FOR RESCISSION
       (Against Fatima Life Plan) .....................................................39

SECOND CAUSE OF ACTION FOR FRAUD
       (Against the Villa Fatima Affiliate Entities, Kelly Copeland,
       Eric Genuis, Michael Sullivan, Barbara Copeland,
       Patrick Copeland, and Jamie Griffith)......................................40

THIRD CAUSE OF ACTION FOR VIOLATION OF FRANCHISE
INVESTMENT LAW
       (Against The Villa Fatima Affiliate Entities, Kelly Copeland,
       Eric Genuis, Michael Sullivan, R. Michael Mohr,
       and Patrick Copeland) ..........................................................43

FOURTH CAUSE OF ACTION FOR CALIFORNIA SECURITIES FRAUD
       (Against The Villa Fatima Affiliate Entities, Kelly Copeland,
       Eric Genuis, and Michael Sullivan) .........................................47

FIFTH CAUSE OF ACTION FOR CALIFORNIA BROKER-DEALER
VIOLATIONS
       (Against Eric Genuis) ...........................................................48

SIXTH CAUSE OF ACTION FOR 10B-5 VIOLATIONS
       (Against The Villa Fatima Affiliate Entities, Kelly Copeland,
       Eric Genuis, Michael Sullivan, Barbara Copeland,
       Patrick Copeland, and Jamie Griffith)......................................50

SEVENTH CAUSE OF ACTION FOR UNFAIR BUSINESS PRACTICES
       (Against The Villa Fatima Affiliate Entities, Kelly Copeland,
       Eric Genuis, Michael Sullivan, Barbara Copeland,
       Patrick Copeland, R. Michael Mohr, and Jamie Griffith)...................51

EIGHTH CAUSE OF ACTION FOR UNJUST ENRICHMENT
       (Against All Defendants).......................................................53

PRAYERS FOR RELIEF .......................................................................53

DEMAND FOR JURY TRIAL ..................................................................57

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

ii

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

# INTRODUCTION

This case concerns the Plaintiffs' recovery of money lost in a fraudulent investment scheme. Defendant Kelly Copeland ("Copeland") approached Plaintiffs Jeff and Marcella Ketelhut (the "Ketelhuts") and sought their investment in a grand enterprise of building and operating skilled nursing facilities for Alzheimer's patients around the country specially catered and marketed toward Roman Catholics under the name "Villa Fatima," a name readily identifiable and attractive to many Roman Catholics, including the Ketelhuts.

Copeland made numerous representations to the Ketelhuts about his Villa Fatima franchises for the purpose of inducing their investment in them. Based on those representations, the Ketelhuts invested $450,000 with Copeland to become area developers of franchises in the greater Denver, Colorado area, to become local franchisees in Encinitas, California, and to become members of the "Villa Fatima" family of affiliate entities.

But as the Ketelhuts later learned, Copeland's representations were false and he knew they were false when he made them. He had no experience in building and operating skilled nursing facilities of any kind, he had no operations team in place ready to build and operate those facilities, and the individuals he intended to employ had checkered histories and associations with known criminal convicts. In addition, while he was telling them about his grand enterprise, he never bothered to tell them that he then had pending against him a lawsuit in Arizona for fraudulent inducement of contract in relation to the purchase of a business, as well as a personal bankruptcy proceeding under Chapter 13.

When the Ketelhuts discovered these and other misrepresentations, they asked for their money back. Copeland agreed to give their money back, just as soon as he collected it from other investors, thus evidencing his intent to engage in

1

a "Ponzi scheme," in which he sought, and is currently seeking, investments from other individuals for the purpose of repaying the Ketelhuts, because he presently claims he has no assets with which to repay them.

Copeland has therefore refused to return the Ketelhuts their money, despite their repeated requests and their earnest attempts to avoid legal proceedings. Indeed, he and his many affiliate entities are mere shells that are allowing him to hide his assets and he is in violation of numerous franchise, securities, and corporate laws.  Many individuals are also co-conspirators with him in his efforts. At root, he and his co-conspirators have engaged in, and are currently engaging in, fraud.  This suit therefore seeks the return of the Ketelhuts' money, general damages, punitive damages, and attorneys' fees, as well as injunctive relief to prevent them from further offering Villa Fatima investments in California.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. §1332(a).  This Court also has jurisdiction under 28 U.S.C. §1331, because this action arises under the anti-fraud provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. §240.10b-5.

2.      Venue is proper within this district under 28 U.S.C. §1391(a).

## PARTIES

**A.     Individual Parties.**

3.      Plaintiff Jeff Ketelhut is an individual and a citizen of the State of California, who resides in the City of Thousand Oaks, County of Ventura, California.

4.      Plaintiff Marcella Ketelhut is an individual and a citizen of the State of California, who resides in the City of Thousand Oaks, County of Ventura,

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

**COMPLAINT**

California.  Plaintiffs Jeff Ketelhut and Marcella Ketelhut are husband and wife and are referred to as the "Ketelhuts."

5.     Defendant Kelly Copeland ("Copeland") is a citizen of Arizona, who resides in Tucson, Arizona.

6.     Defendant Barbara Copeland is a citizen of Arizona, who resides in Tucson, Arizona, and who is married to Defendant Kelly Copeland.

7.     Defendant Eric Genuis ("Genuis") is a citizen of Kentucky, who resides in Shelbyville, Kentucky.

8.     Defendant Michael Sullivan ("Sullivan") is a citizen of Ohio, who resides in Toronto, Ohio.

9.     Defendant Patrick Copeland is a citizen of Arizona, who resides in Tucson, Arizona.  He is the son of Defendant Kelly Copeland and Defendant Barbara Copeland.

10.     Defendant Jamie Griffith ("Griffith") is a citizen of Arizona, who resides in Tucson, Arizona.

11.     Defendant R. Michael Mohr ("Mohr") is a citizen of Arizona, who resides in Tucson, Arizona.

12.     Defendant Edward Slowik ("Slowik") is a citizen of Arizona, who resides in Tucson, Arizona.

13.     Defendant Robert A. Leon ("Leon") is a citizen of Arizona, who resides in Tucson, Arizona.

14.     Defendant Dale D. Pelton ("Pelton") is a citizen of Arizona, who resides in Marana, Arizona.

**B.     Corporate Parties.**

15.     Defendant Fatima Life Plan, Inc. ("Fatima Life Plan") is an Arizona corporation, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

3

16.     Defendant Fatima Partners International, Inc. is an Arizona corporation, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

17.     Defendant VFIP, LLC is an Arizona limited liability company, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

18.     Defendant Villa Fatima Oro Valley, LLC is an Arizona limited liability company, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

19.     Defendant Marbar Plaza LLC is an Arizona limited liability company, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

20.     Defendant Oro Valley Holdings, LLC is an Arizona limited liability company, headquartered in Phoenix, Arizona.

21.     Defendant Bo-Kel Properties, LLC is an Arizona limited liability company, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

22.     Defendant Copeland Construction Ventures, LLC is an Arizona limited liability company, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

23.     Defendant VCL05, LLC is an Arizona limited liability company, headquartered at 8810 E. Tanque Verde Rd., Tucson, Arizona.

24.     Defendant SC118119, LLC is an Arizona limited liability company, headquartered at 641 W. Harrelson St., Tucson, Arizona.

**C.     <u>Villa Fatima Affiliate Entities</u>.**

25.     For all relevant purposes and at all relevant times herein, Defendant Fatima Life Plan controlled and continues to control other affiliate companies, including, Defendant VFIP, LLC and Defendant Villa Fatima Oro Valley, LLC (jointly referred to as the "Villa Fatima Affiliate Entities"). Defendant Villa Fatima Oro Valley, LLC registered the mark "Villa Fatima" with the United States Patent and Trademark Office, Registration No. 4124812 (registration date April 10,

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

4

2012). VFIP, LLC is the current owner of that mark. "Villa Fatima" is also registered in Arizona as being owned by Defendant Copeland.

26. In or about June, 2014, Defendant Copeland formed Defendant Fatima Partners International, Inc. On information and belief, Defendant Fatima Life Plan transferred its ownership, interest, and control to Defendant Fatima Partners International, Inc. Defendant Fatima Partners International, Inc., Defendant Fatima Life Plan, and Defendant Villa Fatima Oro Valley, LLC, are jointly referred to as the "Villa Fatima Affiliate Entities." As used herein, the term "Villa Fatima" may refer to one or more of these entities, or putative entities, depending on the time frame herein and when these entities existed, came into existence, or were represented as likely to come into existence.

### D. Individual Associations With Villa Fatima Entities.

27. For all relevant purposes, and at all relevant times herein, Defendant Fatima Life Plan includes as its directors, Defendant Kelly Copeland, Defendant Slowik, and Defendant Mohr. Defendant Copeland is the President of Defendant Fatima Life Plan; Defendant Mohr is its Vice-President. On information and belief, Defendants Copeland, Slowik, and Mohr shareholders of Defendant Fatima Life Plan and jointly control it as shareholders.

28. For all relevant purposes, and at all relevant times herein, Defendant Fatima Partners International, Inc. includes as its directors, Defendants Copeland, Sullivan, and Genuis. Defendant Copeland is the CEO and Founder of Defendant Fatima Partners International, Inc.; Defendant Sullivan is Executive Vice-President; Defendant Genuis is Senior Vice-President. On information and belief, Defendant Copeland is the controlling shareholder of Defendant Fatima Partners International, Inc., while Defendant Sullivan has a 10% interest and Defendant Genuis has a 5% interest.

COMPLAINT

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

29.     For all relevant purposes, and at all relevant times herein, Defendant VFIP, LLC includes Defendant Copeland as its managing member.

30.     As director, officer, and controlling shareholder of both Defendant Fatima Life Plan and Defendant Fatima Partners International, Inc., Defendant Copeland has control over each of Villa Fatima Affiliate Entities.

31.     For all relevant purposes, and at all relevant times herein, Defendant Patrick Copeland is, or functions as, the chief financial officer for the Villa Fatima Affiliate Entities.

32.     For all relevant purposes, and at all relevant times herein, Defendant Jamie Griffith is an agent and/or employee for the Villa Fatima Affiliate Entities.

**E.     Copeland-Affiliate Entities.**

33.     For all relevant purposes, and at all relevant times herein, Defendant Villa Fatima Oro Valley, LLC includes Defendant Pelton as its managing member and Defendant Copeland as a member.

34.     For all relevant purposes, and at all relevant times herein, Defendant Marbar Plaza LLC includes as its managing members Defendants Slowik, Pelton, and Mohr.  Defendant Copeland is a member of Marbar Plaza LLC.  Defendant Marbar Plaza LLC is a member of Defendant Oro Valley Holdings, LLC.

35.     For all relevant purposes, and at all relevant times herein, Defendant Bo-Kel Properties, LLC includes as its managing member Defendant Robert A. Leon.  Defendant Copeland is a member of Defendant Bo-Kel Properties, LLC.

36.     For all relevant purposes, and at all relevant times herein, Defendant VCL05, LLC includes as its managing member Defendant Mohr.  Defendant Copeland is a member of Defendant VCL05, LLC.

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

**COMPLAINT**

37.    For all relevant purposes, and at all relevant times herein, Defendant SC118119, LLC includes as its managing members Defendant Copeland and Defendant Slowik.

38.    For all relevant purposes, and at all relevant times herein, Defendant Copeland Construction Ventures, Inc. includes Defendant Copeland as director, president, and controlling shareholder.

39.    Defendants Villa Fatima Oro Valley, LLC, Oro Valley Holdings, LLC, Marbar Plaza, LLC, Bo-Kel Properties LLC, Copeland Construction Ventures, LLC, VCL05, LLC, and SC118119, LLC, are referred to as the "Copeland Affiliate Entities."  Except for Defendant Oro Valley Holdings, LLC, the Copeland Affiliate Entities are all headquartered, and all operate, at the same address as the Villa Fatima Entities.  Except for Defendant Oro Valley Holdings, LLC and VCL05, LLC, the Copeland Affiliate Entities all use the same mailing address as the Villa Fatima Entities:  P.O. Box 36958, Tucson, Arizona 85740-6958.

40.    For all relevant purposes, and at all relevant times herein, Defendant Copeland has control over the Copeland Affiliate Entities, except for Oro Valley Holdings, LLC. Defendant Oro Valley Holdings, LLC is a Defendant in this action, because on information and belief, it holds money that belongs to the Ketelhuts by virtue of Copeland's interest in that entity through his interest in, and control over, Defendant Villa Fatima Oro Valley, LLC.

## ALTER EGO ALLEGATIONS

41.    There exists, and at all times mentioned herein there existed, a unity of interest and ownership between and among Copeland and the Villa Fatima Affiliate Entities such that any individuality and separateness between Copeland and the Villa Fatima Affiliate Entities have ceased and the Villa Fatima Affiliate

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

Entities are the alter ego of each other and of Copeland, for one or more of the following reasons:

    A.    The Villa Fatima Affiliate Entities are, and at all times mentioned herein were, mere shells without capital or assets.  The Villa Fatima Affiliate Entities were conceived, intended, and used by Copeland as a device to avoid individual liability and for the purpose of substituting a financially insolvent company in the place of Copeland;

    B.    The Villa Fatima Affiliate Entities are, and at all times mentioned herein were, so inadequately capitalized that, compared to the business to be done by Copeland and risks of loss attendant thereto, their capitalization was either illusory or trifling;

    C.    The Villa Fatima Affiliate Entities are, and at all times mentioned herein, were, the alter ego of Copeland and there exist, and at all times mentioned herein has existed, a unity of interest and ownership between them such that any separateness has ceased to exist in that Copeland used assets of the entities for his personal uses, caused assets of those entities to be transferred to them without adequate consideration, and withdrew funds from the bank accounts for his personal use;

    D.    The Villa Fatima Affiliate Entities are, and at all times mentioned herein were, mere shells, instrumentalities, and conduits through which Copeland carried on his business exactly as he had conducted it previous to organization, exercising complete control and dominance of such business to such an extent that any individuality or separateness of the Villa Fatima Affiliate Entities does not, and at all times mentioned herein did not, exist;

8

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

E.    The Villa Fatima Affiliate Entities are, and at all time mentioned herein were, controlled, dominated, and operated by Copeland as his individual business and alter-ego, in that the activities and business of those entities was carried out without the holding of Director meetings, no records or minutes of any meetings or proceedings were maintained, and Copeland entered into personal transactions with the Villa Fatima Affiliate Entities without proper corporate action and approval.

42.    Adherence to the fiction of the separate existence of the Villa Fatima Affiliate Entities as entities distinct from Copeland would permit an abuse of the corporate privilege and promote injustice in that any judgment entered against any of the Villa Fatima Affiliate Entities, which exist in name only, would be unenforceable without an additional judgment being entered against the true actor, Copeland.

## **GENERAL ALLEGATIONS**

A.    **The Ketelhuts' Introduction To Copeland Through Genuis.**

43.    In January, 2014, Defendant Genuis called the Ketelhuts and told them he was involved with a real estate developer who was establishing a network of skilled nursing facilities to care for Alzheimer's patients.  What made this developer's network unique, Genuis said, was that the facilities would have a distinctly Roman Catholic character to them.

44.    The facilities would adhere to the U.S. Conference of Catholic Bishops' Ethical and Religious Directives for Catholic Health Care Services and they would be based on "culture of life" principles and would respect the dignity of each human life.  He said that each of the facilities would have a Catholic chapel accessible to the patients and their families and promote ready access to such

9

**COMPLAINT**

Catholic sacraments as the Eucharist, Reconciliation, and Anointing of the Sick. Indeed, the facilities would be named under the umbrella trade name, "Villa Fatima," with intended reference to, and under the patronage of, Our Lady of Fatima, a title ascribed to Mary, the Mother of Jesus, which is seen as one of the most popular devotions in the Roman Catholic Church.

45.    Genuis explained that the purpose of his call was to have the Ketelhuts meet the real estate developer and founder of Villa Fatima, Defendant Copeland, and to discuss possible involvement in Villa Fatima with him.  He emphasized that he wanted the Ketelhuts to hear the "Villa Fatima story" directly from Copeland.

46.    Genuis did not reveal to the Ketelhuts that he had a contract with Copeland to receive a "finder's fee" of $20,000 for each individual he introduced to Copeland who became an investor in Villa Fatima.  The Ketelhuts had come to know Genuis through his work as a musical composer and pianist several years earlier and had hosted house concerts with him.  Genuis had promoted his music through house concerts of mostly Roman Catholic individuals and now Copeland was using Genuis to reach those same individuals and parlay investment opportunities in Villa Fatima to them.

47.    Had Genuis told the Ketelhuts that he would be receiving a "finder's fee" of $20,000 for introducing them to Copeland and for their investment in Villa Fatima, the Ketelhuts would not have met with Copeland and would not have invested in Villa Fatima.  But not knowing this information, and based on what Genuis told them, the Ketelhuts were eager to meet with Copeland and hear the "Villa Fatima story."

**COMPLAINT**

**B.   The Ketelhuts' First Meeting With Copeland.**

48.    On February 14, 2014, the Ketelhuts met with Copeland and Michael Bender, who was introduced as Villa Fatima's "Director of Franchise Development."  In that meeting (the "February 14 Meeting"), Copeland represented the same facts that Genuis had represented to them about establishing a network of skilled nursing facilities to care for Alzheimer's patients with a distinctly Roman Catholic character.

49.    Copeland also emphasized to the Ketelhuts his past background in Roman Catholic causes and activities, as a way to demonstrate his credibility and to ingratiate himself into fraternal association with them.  These representations had a powerful effect on the Ketelhuts, because they were deeply sympathetic, and religiously attached, to those causes and activities, as well as to the general intent and focus of Villa Fatima.

50.    Copeland provided the Ketelhuts with an "Executive Summary," which described his plan as follows:

> This project consists of constructing state-of-the-art skilled nursing facilities (SNF) dually licensed to facilitate both transitional/ rehabilitative care and the fast-growing Alzheimer epidemic. These 70-beds, 61,000 sq. foot facilities, consist of private rooms only (approx. 365 sq. ft. /room), are designed as resort-style residential and rehabilitation facilities and offer leading edge methods of care and treatment to both Alzheimer/dementia residents and transitional/ rehabilitation patients. The census mix consists of 34 transitional care patients and 30 Alzheimer care residents and 6 Hospice Care beds. This "sweet spot" generates about $10.2 million in gross revenue. The facility employs 70-80 highly skilled and premium paying jobs to the

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

11

**COMPLAINT**

community while providing both medical and residential services that are currently inadequate throughout our culture. The families who trust their loved ones to a Villa Fatima SNF are assured that everyone involved with this facility is dedicated to the principles of human dignity and respect for the life of each patient regardless of physical or mental limitations. The facility will be certified for Medicare patients, but will also accept private payment and private insurance.

51.     The Executive Summary also projected growth and income for Villa Fatima over the next ten years "assuming five (5) additional franchisees per year and approximately two (2) years development from franchise purchase to operational status, to be 179 fully operational Villa Fatima [skilled nursing facilities] and an additional 95 units in various states of 'start-up." Copeland estimated the gross revenue of operational units would "approach $2 billion annually," with each franchise generating approximately $2.2 million in *net income* which by the tenth (10th) year approached $400,000,000 annually." Further, the Executive Summary represented that the Villa Fatima Affiliate Entities, Culture of Life LLC and Development Fund for Medicaid projects "produce an annual $54 million for nonprofit, pro-family, community based organizations and smaller Villa Fatima's [sic] that serve the poor and underprivileged in local communities through Medicaid and other private charitable resources."

C.     **Copeland's False Representations At The February 14 Meeting.**

52.     During the February 14 Meeting, Copeland represented several facts that were material in leading the Ketelhuts to subsequently invest in Villa Fatima.

53.     Copeland represented that he had been a successful executive home builder in Tucson, Arizona, and that he decided to give away all of his money so

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

he could be like the "rich man" in the Bible who gave away all of his money and pursued the Kingdom of Heaven.  On information and belief, this representation was false.  On information and belief, Copeland did not give away his money; he lost it in failed construction projects.  Indeed, as the Ketelhuts later learned, Kelly and Barbara Copeland had filed a Chapter 13 bankruptcy proceeding in August, 2012, and that proceeding was pending at the time of their meeting.  Had the Ketelhuts known these facts, they would not have invested in Villa Fatima.

54.     Copeland represented that he had already built a Villa Fatima facility in Oro Valley, Arizona, known as the "Oro Valley Facility," but that in the process, he had learned to build an even better facility and that facility would be the franchise model for other Villa Fatima facilities.  Copeland represented that he sold the Oro Valley Facility to a company known as "CopperSands," taking a 25 percent ownership interest in it.  These representations were false, as the Ketelhuts later learned.  While he undertook plans to build the Oro Valley Facility, Copeland never finished building it.  He sold it to Defendant Oro Valley Holdings, LLC (the company known as "CopperSands") in mid-stage construction and he never had an operational team in place to operate that facility.  The facility stands today, unfinished, without occupancy and operation.  Had the Ketelhuts known these facts, they would never have invested in Villa Fatima.  As further evidence of his alter ego associations, the 25 percent ownership interest he claimed to have personally owned in that facility, is, on paper, owned by a Villa Fatima Affiliate Entity, Defendant Villa Fatima Oro Valley, LLC.

55.     Copeland represented that he had an operational team in place that had industry experience in running healthcare facilities that were consistent with strong Catholic leadership and character traits.  This representation was false.  Had

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

13

**COMPLAINT**

the Ketelhuts known this representation was false, they never would have invested in Villa Fatima.

56.    Copeland represented that he had already sold franchise rights to a Villa Fatima facility in Phoenix, Arizona, known as "Phoenix #1," and was presently "lining up investors" to buy franchise rights to other Villa Fatima facilities, including another local facility known as "Phoenix #2," as well as facilities in Houston, Texas, and Encinitas, California.  He said that ground-breaking was scheduled to occur for Phoenix #1 the following month and for the facility in Houston, Texas, in early June, 2014.  Those representations were false, as the Ketelhuts later discovered.  Copeland had concocted a religious ceremony for the "blessing" of the ground in March, 2014, through which he conveyed the notion to the general public through mailings and press publicity that ground-breaking was occurring.  He had also announced a similar ground-breaking ceremony for a Villa Fatima Franchise facility in Houston, Texas, to be held in early, June, 2014.  But that was for a "ground blessing," too.  To this day, ground has not been broken on Phoenix #1 or on any facility in Houston, Texas.

57.    Among the documents Copeland gave them at the February 14 Meeting was a detailed operating budget that represented a 24-month projection of revenue and operating expenses.  The budget projected a net profit after capital costs at $772,441 for the first year (or 10.0 percent), and $1,682,244 for the second year (or 17.4 percent).  These numbers, the Ketelhuts would later learn, were fictional estimates with no basis in reality.

58.    The principal thrust of Copeland's representations to the Ketelhuts at the February 14 Meeting was that Villa Fatima was fully operational, that he and his team had actual experience in building Catholic Alzheimer's facilities, that he had resources available to begin building and operating additional franchise

**COMPLAINT**

facilities immediately, and that his sole interest was in securing franchisees who were interested in acquiring franchise facilities.  All of these representations were false, as the Ketelhuts later learned.  On information and belief, Copeland was not interested in securing franchisees, but in acquiring proceeds from potential investors so he could pay off debts.  He had no present intention of commencing building on any franchise facility, because he was severely undercapitalized.

59.     Had the Ketelhuts known that any one of these representations that Copeland made at the February 14 Meeting were false, they never would have invested in Villa Fatima.

60.     During the course of the February 14 Meeting and in the weeks following, Copeland urged the Ketelhuts to invest in Villa Fatima several ways: with a $50,000 initial investment that would induce them into the "Villa Fatima Family," as a partner either in Phoenix #1 or #2, as a partner in a facility to be built in Encinitas (the "Encinitas Joint Venture"), and as a regional developer for the Denver, Colorado area.

61.     Copeland's representation regarding the Encinitas Joint Venture was attractive to the Ketelhuts, because Copeland told them that it would be affiliated with a Catholic organization known as the "Divine Mercy Motherhouse," located in Stockbridge, Massachusetts.  That center has a strong international following among Roman Catholics, including the Ketelhuts.  Copeland told them he had arranged a joint venture with the individual who donated ten acres to the Divine Mercy Motherhouse and who had allocated four of those acres for a Villa Fatima facility.  These representations were false.  As the Ketelhuts later discovered, no agreement existed between Villa Fatima and the owner of the Encinitas property, or between the owner of the Encinitas property and the Divine Mercy

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

Motherhouse.  Had the Ketelhuts known these facts, they would not have been interested in investing in the Encinitas Joint Venture.

### D.   The Fatima Affiliate Entities.

62.   During the February 14 Meeting, Copeland represented to the Ketelhuts that he had a network of entities at hand to perform the work of Villa Fatima and he described in detail what work they do, consistent with a document he sent them shortly after the meeting, captioned "Ancillary Income Summary," ("Summary").  That Summary, which incorporated other accompanying documents by reference, purported to detail Villa Fatima's operational team and projected revenues.  The Summary addressed several Villa Fatima affiliate entities, including Templar, Coraggio, and Angela's Café.

#### 1.   Templar.

63.   During the February 14 Meeting, Copeland told the Ketelhuts that he had working on his team Tim Ayers and his son, Patrick Ayers (jointly, the "Ayers"), who were in charge of overseeing the operations of all Villa Fatima franchise facilities.  The Ayers were principals in an entity known as Templar Holdings, LLC, or "Templar," located in Louisville, Kentucky, and had extensive experience in operating healthcare facilities.

64.   According to the Summary, Templar owned and operated three companies:  Trinity Management, Basilica Construction, and Flaget Financing (also known as Templar Financing).  The Summary represented that Fatima Life Plan had a 10 percent ownership interest in Templar and "anticipated the ancillary income from this partnership to run the low millions annually."  The Summary does not describe the business activities of those three companies or their management and related concerns.

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

**COMPLAINT**

65.    The Ketelhuts, however, later discovered disturbing facts about the Ayers and their business associates.  The Ayers conducted their business activities out of an office in Louisville, Kentucky.  That office is also the address for three other companies, Cornerstone Healthcare, Shiloh Health Services, and Carraway Medical Systems.  The Ayers were, and are, officers in those companies.  Until recently, their fellow business associates included Chuck Fulner, Herschel Brieg, and James Cheek.

66.    In 2013, Chuck Fulner was dismissed as CEO of a hospital affiliated with the Ayers' entities.  A warrant was issued for his arrest after he struck the lead nurse in a staff meeting, the news of which became notorious locally.

67.    In 2011, Patrick Ayers was serving as CEO of Shiloh Health Services when two of its officers, Herschel Brieg and James Cheek, were indicted for tax fraud.  They were convicted of those charges a year later in a high profile public proceeding and sentenced to 60 months in Federal prison, along with a $5 million fine.  At their sentencing, U.S. District Judge Sam Cummings stated, "I want to send a message to other hospital administrators that you cannot take charge of a small hospital and run it into bankruptcy, and walk away with money in your back pocket."

68.    Thus, three of the Ayers' close business associates had been involved in public scandal and criminal activity and, specifically, in the very area in which Copeland was touting the Ayers' capacity to perform – operation of healthcare facilities.

69.    Moreover, as the Ketelhuts later learned, Templar was not staffed with numerous employees ready, willing, and able to operate skilled nursing facilities. It was essentially a shell organization with no employees through which the Ayers conducted their business activities.

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

70.     Nor did the Ayers have any experience in operating skilled nursing facilities that were consistent with strong Catholic leadership and character.  Their experience to date was working with secular facilities.  Indeed, as the Ketelhuts later discovered, serious questions would be raised about whether the Ayers were actually committed to strong Catholic principles.  Patrick Ayers was active in promoting and marketing a men's health clinic, whose products and services were in contravention to the teachings of the Roman Catholic Church.

71.     Had the Ketelhuts known about the business associates of the Ayers, and the level of trust that Copeland and Sullivan had entrusted in them to operate and maintain the Villa Fatima franchise facilities, they never would have invested in Villa Fatima.

### 2.     Coraggio.

72.     According to the Summary, Coraggio is a "Catholic healthcare initiative" that "brings members together to share each other's healthcare costs."  Under this initiative "[e]ach month, member shares are matched with another's eligible medical bills.  Coraggio will facilitate this direct share of medical costs among its members."

73.     The Summary explains that Coraggio "has procured contractual arrangements" that would make it exempt under the Affordable Care Act.  As the Ketelhuts later learned, this statement was, and is, false.  Had the Ketelhuts known it was false they never would have invested in Villa Fatima.

74.     The Summary states that Corragio "plans to start with 500 to 1,500 members in 2014," and by the end of 2015 "project[s] to enroll in excess of 100,000 families."  "Projected annual revenue," it stated, "will exceed $750,000,000 with an industry that works on a 4-6% profit margin."  Further, "[a] Catholic benefits component will also be an additional revenue source."

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

18

**COMPLAINT**

75.    The Summary purports to have three noted Roman Catholic clerics as member of its Advisory Board:  Raymond Cardinal Burke, the Prefect of the Supreme Tribunal Apostolic Signature in Rome, Bishop Robert Vasa, head of the Diocese of Santa Rosa, California, and Fr. Tad Pacholzyk, Director of Education at the National Catholic Bioethics Center.  On information and belief, the Ketelhuts later learned that none of these clerics knows they are Advisory Board members to Coraggio and none of them knows about Copeland's fraudulent representations to the Ketelhuts.  Nevertheless, Copeland's representation that these clerics were Advisory Board members was a material fact that led the Ketelhuts to invest in Villa Fatima.  Had the Ketelhuts known it was false they never would have invested in Villa Fatima

**3.    Angela's Café.**

76.    According to the Summary, Angela's Café "is a nutritionally supportive restaurant providing meals to meet the individual needs of chronic and terminally ill patients and their families led by an experienced team of nutrition experts, physicians, culinary experts and leading researchers." The Café "is on a mission to reduce the number of chronically ill patients who dies of malnourishment while improving their quality of life and helping them to suffer well by eating well."

77.    The Summary explains Angela's Café's relationship to Villa Fatima: "Angela's Cafe has contracted with Villa Fatima, a skilled nursing and Alzheimer's care facility to be their preferred provider of dietary and nutritional support for their facilities.  Angela's Café will provide on demand dining along with a coffee and juice bar for all patients, guests and employees in each facility.  The menu is prepared with an understanding of patient's tastes, preferences and needs while always ensuring the highest

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

level of nutrition possible.  Angela's Café uses the highest quality, locally sourced ingredients with an aim at providing the highest level of nutrition possible."

78.   The Summary therefore represents that Angela's Café is fully operational and engaged in providing the services it purports to offer.  Such representations include the foregoing representations, and this representation:

"Angela's Café meals are prepared on state of the art equipment and then flash frozen to retain the nutritional value.  These meals are available to be shipped to the homes of chronically ill patients, elderly and their caregivers. Our meal delivery program to families of Villa Fatima patients as well as cancer patients and the homebound through partnerships with hospitals and home care providers."  [Sic]

79.   As the Ketelhuts later learned, the Summary's representation that Angela's Café was fully operational was false.  Angela's Café provides no services to any facility, much less to any Villa Fatima facility; it is not operational. Angela's Café is not "led by an experienced team of nutrition experts, physicians, culinary experts and leading researchers."  It does not employ any nutrition experts, much less any physicians, culinary experts, or leading researchers.

80.   The founder of Angela's Café is Chris Faddis, a marketing strategist, who named the entity in honor of his deceased wife who died of cancer.  The Ketelhuts later learned that Faddis is not a nutritionist and has no experience in providing meals for chronically ill patients, the elderly, and their caregivers, on an institutional basis.  The Ketelhuts later learned that Copeland had employed Defendant Genuis, the concert pianist who had procured their introduction to him, and who had no professional nutritional experience or training, to supervise the nutritional program for Angela's Café.

81.     Had the Ketelhuts known that Angela's Café was not fully operational, they would not have invested in Villa Fatima.

82.     The Summary further represents the existence of "key partnerships" for the marketing and distribution of meals:

> In addition to the partnership with Villa Fatima, Angela's Café has secured partnerships with key partners to market our nutrition and meal service programs and to distribute our meals to our clients.  Our key partnerships to date include: · Villa Fatima  · Synergy HomeCare · Spectracell Laboratories · Cancer Treatment Centers of America · Envita Medical Centers · MD Anderson Cytokine Research Lab.

As the Ketelhuts later learned, this representation was, and is, false.  On information and belief, Angela's Café has no formal agreements or "partnerships" with any of these entities (other than, perhaps, with Villa Fatima).

83.     The Summary projected how Angela Café would grow with its contracts with Villa Fatima alone over the next five years:

> Angela's Café will open two central kitchen operations and up to five care operations in 2015, [r]esulting in a first year revenue exceeding $10 million. Following the growth pattern of Villa Fatima, Angela's Café is projected to open 45 café's and 10 central kitchens by year five of operations.  We project revenue of $72 million by year five of operations in an industry that operated on a profit margin of 18-20%."

As the Ketelhuts later learned, these projections were fiction and not based on any reality.  Had the Ketelhuts known the projections were fiction, they would never have invested in Villa Fatima.

84.     The Summary touted an Advisory Board of three high-profile individuals:  Dr. Bharat Aggarrwall, Director of the Cytokine Research Lab and

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

21

Professor of Experimental Therapeutics, University of Texas MD Anderson Cancer Center, Rebecca Katz, expert nutritionist and author of "The Cancer Fighting Kitchen" and "The Longevity Kitchen," and Dr. William Sears, a world-renowned pediatrician and author on health and wellness. As the Ketelhuts later learned, on information and belief, none of these individuals knew they were Advisory Board members to Angela's Café when Copeland gave them the Summary. Nevertheless, Copeland's representation that these individuals were Advisory Board members was a material fact that led the Ketelhuts to invest in Villa Fatima.

85.    Moreover, as the Ketelhuts later learned one of these so-called "Advisory Members," Dr. Bharat Aggarwal, was under investigation by University of Texas and medical authorities for fabrication and falsification of published studies about the cancer-fighting properties of plants.

86.    Further, while the Summary represents that Angela's Café is a viable, independent entity with business interests apart from Villa Fatima, as the Ketelhuts later learned, that representation was, and is, false. Copeland owns a 51 percent interest in Angela's Café. As the Ketelhuts later learned, Copeland acquired that interest in exchange for retiring the certain debts of Faddis, who was financially insolvent. Had the Ketelhuts known any of these facts about Angela's Café, they never would have invested in Villa Fatima.

**E.    The Ketelhuts' Investment Proposal.**

87.    Following the February 14 Meeting, and in reliance on the representations made to them during this meeting, the Ketelhuts decided to invest in Villa Fatima.

88.    By email dated March 5, 2014, the Ketelhuts advised Copeland that they were interested in investing in Villa Fatima and made a counter-offer to him,

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

22

**COMPLAINT**

based on the offers Copeland made to them in the February 14 Meeting:  To invest $50,000 to join the "Villa Fatima Family," to invest $250,000 in Phoenix #2 (unless Phoenix #1 was available, as Copeland said it was potentially available), to invest $500,000 in the Encinitas Joint Venture, and to invest $150,000 in the Regional Developership for Denver.

89.    Copeland responded by email the same date and said "[t]hese terms are agreeable to all parties."

90.    Two days later, on March 7, 2014, Jeff Ketelhut sent Copeland by email a list of questions he had regarding Villa Fatima and the documents that Copeland had sent him.  Among those questions included specific questions regarding the financial statements and projections of the company, the identity and background of individuals on the Villa Fatima operational team, especially, Templar, the number of franchises actually sold, the number of franchises anticipated to be sold, Villa Fatima's ability to build and operate those facilities, and details regarding start-up plans and completion schedules.

91.    In response, Copeland pressed the Ketelhuts to meet his "team" and to talk to his "numbers guys" to get answers to their questions.  He also said he was coming to the Los Angeles area soon and suggested they meet to discuss matters further and to wrap up the Ketelhuts' investment in Villa Fatima.

**F.    The March 7 Conference Call.**

92.    On March 7, 2014, at Copeland's initiative, the Ketelhuts had a conference call with Copeland's "team" and his "numbers guys" – the Ayers, and the Ayers' colleague at Templar, David Carter ("Carter") (the "March Conference Call").  Each of them stressed to the Ketelhuts their personal religious faith, and their dedication to the mission of Villa Fatima and the on-going development of franchise sales, regional developer sales, and organizational growth.  They also

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

23

**COMPLAINT**

emphasized they were life-long experts in their respective fields, ready to begin immediate work on each of the franchises being offered for sale.

93. As the Ketelhuts later learned, none of these individuals was, in fact, working full-time for Villa Fatima, but each of these individuals concealed this information from the Ketelhuts and led them to believe they were working full time for Villa Fatima and were fully-operational for it.  Had the Ketelhuts known this information, they would not have invested in Villa Fatima.

94. During the March Conference Call, the Ketelhuts asked for details about the number of Villa Fatima franchises sold and under construction.  The Ayers and Carter explained that several had been sold – franchises in Phoenix, Arizona, Woodlands, Texas, and San Antonio, Texas – and that several joint ventures were about to close – three in Houston, Texas, one in Arlington, Virginia, and another in San Diego, California.

95. The Ketelhuts asked for details about the length of time to build a Villa Fatima facility from start-up plans through completion.  The Ayers and Carter explained that the process takes approximately 24 months and they discussed the details involved in that process.

**G.   The March 14 Meeting With Copeland And Sullivan.**

96. On March 11, 2014, four days after the March 7 Conference Call, Copeland sent the Ketelhuts by successive emails unexecuted copies of three documents bearing captions, "Convertible Promissory Note;" "Regional Development Agreement," and "First Addendum Regional Development Agreement."

97. On receiving the Convertible Promissory Note, by email the same day, Jeff Ketelhut asked Copeland to explain its purpose and whether it was related to his investment in the Encinitas Joint Venture.

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

24

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

98.     Copeland responded by email the same day and said:

"Yes . . .

"The monies you deposit with us will be applied to the Encinitas property . .

. Or you can choose one at your own discretion

"The note acts as the mechanism

"Secures your investment the best

"We did not write up anything on the Phoenix investment because those documents are just being written now

"When they become available then we can review and discuss them

99.     On receiving the Regional Development Agreement and First Addendum Regional Development Agreement by email the same day, Jeff Ketelhut advised Copeland that he had "lots of questions" about those documents and that he wished to obtain clarification regarding them.

100.     By email the same day, Copeland responded to Jeff Ketelhut's email query and suggested that he "[t]ab the document" or "[w]rite out questions."  He said, "To give you some peace . . . most of the items that deal with an RD having an office, training franchisee's, taking the class etc. are all N/A to you.  We are waiving those requirements for the first 'round' of RD's.  Mainly because we CAN NOT allow any franchise to fail so we (corporate) take over all those duties."

101.     By email the same day, Jeff Ketelhut responded and noted that "the Development Fee listed of $250K to $900K on page 5 is a big one."  Copeland responded immediately and said, "The range of 250,000-900,000 [sic] is accurate / I'm selling you Denver for a discount!!! / Min. fee was set at 250,000..I'm waving [sic] that requirement as well."

**COMPLAINT**

102.   Copeland then called Jeff Ketelhut and told him he was coming to the Los Angeles area later that week and that they could meet and go over his questions.  Eager to get answers to their questions, the Ketelhuts agreed to do so.

103.   On March 14, 2014, the Ketelhuts met Copeland at the Whisper Lounge in Los Angeles, California (the "March 14 Meeting").  Accompanying Copeland at this meeting was Michael Sullivan ("Sullivan"), who was introduced as Villa Fatima's Executive Vice President.

104.   Copeland employed Sullivan to bring special credibility to his representations, because Sullivan formerly served as executive director to Catholics United for the Faith (CUF), an international lay apostolate of the Roman Catholic Church, based in Steubenville, Ohio, which enjoys international credibility among many Roman Catholics for its mission and work.  Copeland knew the Ketelhuts placed their trust in CUF and in individuals associated with CUF, and he sought to benefit from that trust by having them meet Sullivan.

105.   Copeland and Sullivan brought to the March 14 Meeting, and gave the Ketelhuts at that meeting, a folder containing a number of documents concerning Villa Fatima's plans, income statements, projections, growth charts, and other information.

106.   In that meeting, Copeland reiterated each of the representations he had made at the February 14 Meeting – that Villa Fatima was fully operational, that he and his team had actual experience in building Catholic Alzheimer's facilities, that he had resources available to begin building and operating additional franchise facilities immediately, and that his sole interest was in securing franchisees who were interested in acquiring franchise facilities.  Indeed, he said that Phoenix #1 would begin generating revenue, with resident patients located at that facility, no

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

**COMPLAINT**

later than sixteen months later.  And again, he made no mention of the pending fraud suit or his Chapter 13 bankruptcy proceeding.

107.   The Ketelhuts asked Copeland about the Regional Developer Agreement and Copeland explained it would give them the right to an area franchise, that is, they would have the right to develop any number of Villa Fatima franchise facilities within the greater Denver, Colorado area.  Copeland explained that, normally, he would offer an area franchise to an investor for a much higher amount, but that he was willing to offer it to them for a discount, because he was earnest in getting them on "his team."

108.   At the conclusion of the meeting, Copeland urged the Ketelhuts to sign the Convertible Promissory Note and Regional Development Agreement as of March 19, 2014, because that was the Feast Day of St. Joseph, and because Copeland would be hosting a "ground-breaking" ceremony at Phoenix #1 that day. The Ketelhuts agreed to do so.

### H.   The March Note And Developer Agreement.

109.   Thus, on March 17, 2014, the Ketelhuts executed two agreements: (a) A Convertible Promissory Note, bearing the date March 19, 2014 (the "March Note"); and (b) A Regional Developer Agreement, which included a First Addendum Regional Developer Agreement, also bearing the date of March 19, 2014 (jointly, the "Developer Agreement").  A copy of the March Note is attached as Exhibit A; a copy of the Developer Agreement is attached as Exhibit B.

110.   Under the March Note, Fatima Life Plan promises to pay the Ketelhuts $50,000, with no interest on the principal balance outstanding, "from the date hereon until the date that is five years [from that date.]"  Article 2 provides that at any time during the term of the March Note, the Ketelhuts will have, at their sole discretion, "the right to convert this Note into a Joint Venture Position in any

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

**COMPLAINT**

Joint Venture opportunity presented by [Fatima Life Plan] by delivering written notice of its election along with the surrender of this originally executed Note."

111.   Under the Developer Agreement, Fatima Life Plan granted the Ketelhuts the right to own and operate a "Regional Development Franchise" that would solicit, qualify, train, and assist unit franchisees in opening and operating Villa Fatima Unit Franchisees within a defined geographic development area, namely, the greater Denver, Colorado area. The Developer Agreement required the Ketelhuts to pay an initial deposit of $50,000.

112.   Thus, the combined consideration for the March Note and the Developer Agreement was $100,000.  Copeland instructed them to send that amount by wire to a specified bank account.  The Ketelhuts did so.

**I.     Copeland's Bait-And-Switch.**

113.   On March 17, 2014, immediately after the Ketelhuts wired $100,000 to Copeland, Copeland called Jeff Ketelhut and advised him that Phoenix #1 was now unavailable for the Ketelhuts' investment.  Copeland explained that Michael Endredy ("Endredy") wished to have sole investment participation in Phoenix #1. Copeland advised the Ketelhuts to invest, instead, in Phoenix #2 as they initially proposed in their March 5 email.

114.   As the Ketelhuts later learned, Copeland's representation about Endredy's desire to be a sole investment participator was false.  Endredy had only invested $300,000 in Phoenix #1, and approximately $2 million was needed to fully fund the development of Phoenix #1.

115.   On information and belief, Copeland made that false representation to them, because he wished to create an illusion that he had multiple Villa Fatima franchises sold by having the Ketelhuts invest in a separate Villa Fatima franchise.

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

28

116.    Based on Copeland's representation, Jeff Ketelhut told Copeland that the Ketelhuts would still accept an investment in Phoenix #2, in lieu of the investment in Phoenix #1 they had proposed in their March 5 email.  Copeland agreed to this re-arrangement.

117.    But this opportunity, too was switched on them.  On or about March 21, 2014, shortly after the so-called ground-breaking ceremony for Phoenix #1, Copeland called Jeff Ketelhut and advised him that investment in Phoenix #2 was no longer available, because he had secured a $2 million investment from an Italian couple who wished to have that investment.  Copeland said that he would find another franchise investment opportunity for them.

118.    Again, on information and belief, Copeland's representation to the Ketelhuts that Phoenix #2 was no longer available was intended to force them to accept yet another Villa Fatima Franchise so Copeland could further the perception to other potential investors that multiple franchises had been sold.

119.    Nevertheless, the Ketelhuts accepted Copeland's representations that, first, Phoenix #1 was unavailable for investment, and next, that Phoenix #2 was unavailable for investment, but that an additional investment opportunity would arise imminently.  For this reason, that same day, on or about March 21, 2014, the Ketelhuts delivered executed copies of the March Note and Developer Agreement to Copeland, who advised them he would present them to the Board of Directors of Fatima Life Plan that same day, and secure his authority to execute them.  The Ketelhuts have no knowledge of whether Copeland, in fact, presented those documents to the Board of Directors of Fatima Life Plan on March 21, 2014, whether that Board gave him authority to execute them, and whether he so executed them.

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

29

J.      **The April Note.**

120.    On or about April 1, 2014, after the investment opportunities in Phoenix #1 and Phoenix #2 had purportedly evaporated, Copeland called Jeff Ketelhut and told him that Tim Ayers had a "great idea" to integrate the Ketelhuts into the "Villa Fatima Family." He said the Ketelhuts could apply the $50,000 given under the terms of the Note to an investment in the Encinitas Joint Venture, and then provide Villa Fatima with a line of credit that would give them a right of first refusal on any development opportunity that needs capital enhancement, and a guaranteed loan that would give them a steady rate of return and an ownership interest in Fatima Life Plan. Still ignorant of the false representations Copeland and others had made to them, the Ketelhuts said they would consider such a proposal.

121.    By email dated April 3, 2014, Tim Ayers outlined a new investment plan for the Ketelhuts. He proposed that the Ketelhuts provide Villa Fatima with $450,000 that would be put in a "new interest bearing account specifically for Villa Fatima projects, which would be "used on a case by case basis to enhance other Villa Fatima franchisees and joint ventures." He reiterated what Copeland told him: "Essentially they [the Ketelhuts] are given a right of first refusal on any [Villa Fatima] deal that needs capital enhancement." Second, he proposed that the Ketelhuts loan Fatima Life Plan $350,000 "as soon as possible in order to assist with operations and for all general corporate purposes." The loan would provide them with 4 percent interest per annum, and be paid in 36 months, subject to a 12-month extension. In addition, "the Ketelhuts receive a 2% ownership of Fatima Life Plan."

122.    Unbeknownst to the Ketelhuts, Ayers' proposal was a ruse to obtain cash for a cash-strapped organization and both Ayers and Copeland knew, at the

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

time of the proposal, that Villa Fatima had no likelihood of repaying the Ketelhuts these funds according to the terms proposed.

123.   By email dated April 4, 2014, Jeff Ketelhut asked Tim Ayers the following questions:  "Is it possible to anticipate, define or predict what the 2% ownership in Fatima Life Plan entails in terms of benefits, privileges or return on investment per annum?  and when would these ownership benefits begin to be realized?"

124.   Tim Ayers responded by email the same day and stated that he had checked with Copeland and Copeland said:  "Ownership in Fatima Life Plan encompasses ALL companies that have been established to further the vision statement.  Currently the income producing ventures are Franchisees and Corporate owned Joint Ventures.  [Fatima Life Plan] has plans to expand into food service, health insurance, publishing, pharmaceutical, and many other possibilities. / Current projections are for the revenue stream to start producing income from approx. 10 ventures currently sold or in the process of being sold. / The profit portion represented by an approx. net income of 3,00,000 [sic] would generate a annual return of 60,000 (based on 2% ownership interest) / We anticipate over 180 franchises in the next 10 years / Other business will also be profitable."

125.   Copeland's representation, and Tim Ayers' communication of that representation, was false and both Copeland and Ayers knew it was false when Ayers communicated it.  As the Ketelhuts later learned, Villa Fatima did not have any current income producing ventures, whether as Franchisees or "Corporate owned Joint Ventures."  Moreover, the projections for revenue streams were fiction, and intentionally misleading.  Villa Fatima did not have "10 ventures currently sold or in the process of being sold."  Both Copeland and Ayers knew this was misleading when Ayers communicated it.

31

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

126.   Not knowing Copeland and Ayers were lying to them, the Ketelhuts proceeded to provide Copeland with a cash transfer in the amount of $350,000, and to execute a second Convertible Promissory Note dated April 14, 2014 (the "April Note").  A copy of the April Note is attached as Exhibit C.  In addition, the Ketelhuts provided Copeland with a letter of credit, representing a pledge of $450,000 that could be used in future Villa Fatima franchise opportunities.

127.   Under the terms of the April Note, Fatima Life Plan promised to pay the Ketelhuts $350,000, with interest paid annually at 4 percent, with an optional one-year extension.  Article 2 of the April Note provides:

"In exchange for the note, [Fatima Life Plan] will issue non-voting stock in Fatima Life Plan, Inc. equivalent to a 2% ownership interest.  The repayment of the $350,000 loan will begin thru Profit Distribution in approximately 2 years.  Immediately following the complete reimbursement of 350,000.00 this note will become complete and considered paid in full.  [Fatima Life Plan] retains the 2% stock ownership and profit distribution in accordance with the guidelines established by Fatima Life Plan, Inc. and profit distribution will be distributed on an annual basis."

128.   As with the previous wire transfer, Copeland instructed the Ketelhuts to wire the money to him at a specified account.  The Ketelhuts did so.  Unbeknownst to them, the specified bank account was a personal bank account held in joint tenancy by Defendant Patrick Copeland and Defendant Jamie Griffith.

129.   On information and belief, Defendant Patrick Copeland and Defendant Jamie Griffith transferred the money to Copeland and/or one or more of the Villa Fatima Affiliate Entities.  On information and belief, because Defendant Patrick Copeland and Defendant Jamie Griffith worked for Copeland and were under his direction and control, both Defendant Patrick Copeland and Defendant

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

32

**COMPLAINT**

Jamie Griffith had knowledge of the Misrepresentations alleged herein and were co-conspirators with Copeland in defrauding the Ketelhuts of their funds.

130.    On or about April 18, 2014, Copeland sent the Ketelhuts a document purporting to be a stock certificate in Fatima Life Plan, and representing that the Ketelhuts were owners of "2 shares ( 2% ownership)" Fatima Life Plan (the "Stock Certificate").  A copy of the Stock Certificate is attached as Exhibit D.  The Stock Certificate bears an issuance date of April 15, 2014.

131.    When Fatima Life Plan issued the Stock Certificate to the Ketelhuts, Fatima Life Plan was not authorized to issue stock in either Arizona or California. The Ketelhuts did not know this until much later.  Had they known this fact, they never would have invested in Fatima Life Plan or any of the Villa Fatima Affiliate Entities.

K.    **The Misrepresentations.**

132.    After the Ketelhuts' tender of $100,000 in exchange for the March Note and the Developer Agreement, and $350,000 in exchange for the April Note, the Ketelhuts discovered that numerous misrepresentations had been made to them which had induced them to execute these agreements (the "Misrepresentations"):

a)    That Genuis was promoting Villa Fatima from selfless motives, when, in fact, he was receiving a "finder's fee" of $20,000 for each individual, like the Ketelhuts, he introduces to Copeland and who becomes an investor in Villa Fatima;

b)    That Copeland had given away all of his money like the "rich man" in the Bible, when, in fact, he had failed in business and had filed a Chapter 13 bankruptcy petition recently;

33

**COMPLAINT**

c)   That Copeland had built the Copper Health Oro Valley facility, when in fact, he sold that facility before it was built, before it was operational, and when it was, as it still is, unfinished;

d)   That Copeland had an operational team in place that had industry experience in running healthcare facilities that were consistent with strong Catholic leadership and character, when, in fact, he did not have such a team in place;

e)   That he had "lined up  investors" to buy Villa Fatima Franchise facilities, when, in fact, he had only lined up prospective investors;

f)   That "ground-breaking" had occurred at Phoenix #1, when, in fact, it had not;

g)   That the Encinitas Joint Venture would be affiliated with The Divine Mercy Motherhouse, when, in fact, no prospective affiliation existed;

h)   That the Ayers were reputable healthcare facility operators, when, in fact, they were tainted with criminally-convicted business associates and with public scandal in running healthcare facilities;

i)   That Templar was a thriving organization employing many health care employees, when, in fact, it was a shell organization with no healthcare employees;

j)   That the Ayers had experience in operating skilled nursing facilities that were consistent with strong Catholic leadership and character, when, in fact, they had no such experience;

k)   That the Ayers were irreproachable Catholics who took their faith seriously, when, in fact, Patrick Ayers was involved with promotion of a men's health clinic that conducted business in contravention to Catholic teachings;

34

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

l)      That Coraggio had procured contractual arrangements that would make it exempt under the Affordable Care Act, when, in fact, it had no such arrangements;

m)      That Coraggio had reputable individuals who had agreed to be members of its Advisory Board, when, in fact, they had not so agreed;

n)      That Angela's Café was a fully operational food provider to skilled nursing care facilities, when, in fact, it was not operational and its sole business was future business with Villa Fatima franchise facilities that did not yet exist;

o)      That Angela's Café employed nutritionists, physicians, culinary experts, and leading researchers, had experience in providing nutritional support for skilled nursing care facilities, and had experience in providing dietary and nutritional support for chronically ill patients, the elderly, or their caregivers, when, in fact, it had no such experience whatsoever;

p)      That Genuis was involved in marketing Villa Fatima, but not that Angela's Café intended to employ him as supervisor of the nutritional program when he had no experience in that area;

q)      That Angela's Café had reputable individuals who had agreed to be members of its Advisory Board, when, in fact, they had not so agreed;

r)      That Angela's Café had a distinguished and reputable Advisory Board member, when, in fact, that member was under investigation for fraud by university and medical authorities;

s)      That Angela's Café had secured partnerships with various established, reputable companies, when, in fact, it had not done so;

**COMPLAINT**

t)      That Angela's Café was an entity wholly independent from Villa Fatima, when, in fact, Copeland and/or Villa Fatima had a majority ownership interest in it;

u)      That numerous Villa Fatima Franchises had been sold, when, in fact, they had not been sold;

v)      That the process for building a Villa Fatima Franchise takes approximately 24 months, when, in fact, that process was unknown;

w)      That Phoenix #1 was unavailable for the Ketelhuts to invest in, when, in fact, it was so available to them;

x)      That the budgetary information and income predictions for Villa Fatima and the Villa Fatima franchises were based on historical assessments and sound business practices, when they were based on pure fiction;

y)      That the March Note allowed the Ketelhuts to convert that Note into a joint venture position in any joint venture or franchise opportunity they wished, when, in fact, it did not give them such options;

z)      That the April Note gave the Ketelhuts an interest in Villa Fatima, when, in fact, it gave them no meaningful interest whatsoever.

133.    On or about June 10, 2014, and after the Ketelhuts' tender of $100,000 in exchange for the March Note and the Developer Agreement, and $350,000 in exchange for the April Note, Copeland (through Defendant Griffith) provided the Ketelhuts with a document purporting to be a "Franchise Disclosure Document" on behalf of Fatima Life Plan.  The Franchise Disclosure Document represented that California required the Document to be registered or filed with it, or be exempt from registration.  It further represented that its registration in California was "pending."  On information and belief, the Franchise Disclosure

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

Document was never "pending" in California and it has never been registered with California. Indeed, it bore a date of more than a year earlier, March 19, 2013.

134.   Nothing in the Franchise Disclosure Document purported to recant, or warn against, any of the Misrepresentations made.

135.   Moreover, the Franchise Disclosure Document included two additional facts that neither Copeland, nor any individual, had previously disclosed to the Ketelhuts:  (a) That Defendant Copeland was a named defendant  in a currently pending Arizona state court action for fraudulently inducing the plaintiffs in that action to purchase a business ("State Court Fraud Action"); and (b) That Defendants Kelly and Barbara Copeland had a pending bankruptcy proceeding under Chapter 13 ("Chapter 13 Proceeding").

136.   Had the Ketelhuts known of the State Court Fraud Action or the Chapter 13 Proceeding before they made their investment in Villa Fatima, the Ketelhuts never would have invested in Villa Fatima.  To the extent any Defendant as alleged herein made the Misrepresentations to the Ketelhuts, that same Defendant concealed the existence of the State Court Fraud Action and the Chapter 13 Proceeding from them, and such concealments constitute additional "Misrepresentations."

**L.**     **The Rescission Demand.**

137.   On July 22, 2014, the Ketelhuts met with Copeland and Sullivan at their residence in Thousand Oaks, California.  The Ketelhuts advised them that they no longer wished to be associated with Villa Fatima and that they wanted their investments back.  The Ketelhuts so advised them, because of their discovery of the Misrepresentations.

138.   Copeland agreed to return all of their investments, which had totaled $450,000.  He said that he needed time to do so.  The Ketelhuts requested that he

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

return it by September 8, 2014, and Copeland agreed to do so as soon as possible, if not by that date.

**M.    Copeland's Furtherance Of A Ponzi Scheme.**

139.    Copeland did not return the Ketelhut's money on September 8, 2014. He requested additional time to return it.  He said that he had been trying to find additional investors and to raise funds to be able to pay that amount back to them. The Ketelhuts gave him that additional time, but to no avail.

140.    On September 16, 2014, Sullivan spoke with Jeff Ketelhut by telephone and told him that Copeland was "100%" committed to returning their money to them, that they have no available funds to do so presently, that another investor (Joe Cantu) owed Villa Fatima $45,000 and Copeland was hoping to pass that payment onto the Ketelhuts, that Copeland was meeting with a prospective investor (Mark Baumann) on October 28, 2014, about purchasing the Denver Regional Developership and if that meeting was successful, Copeland would pass on that money to them.

141.    By email dated September 22, 2014, Sullivan advised the Ketelhuts: "Just to bring you up to speed, Austin and Dallas Regional Developerships did not sell, and as you know, we are in the operations phase of a start-up company, so our focus must be sharply attuned to the company's success.  Maintaining this course and this focus is the best thing for the Ketelhuts, and for the company.  (The sooner we are profitable, the sooner you will see your loan paid back.)"

142.    On information and belief, Villa Fatima is insolvent.  To the extent Copeland and Villa Fatima intend to return the Ketelhuts' money, Copeland and Villa Fatima intend to do so by collecting funds from other Villa Fatima investors. In other words, Copeland and Villa Fatima are presently engaged in a "Ponzi

**COMPLAINT**

*The Alvarez Firm, a Law Corp.*
*24005 Ventura Blvd.*
*Calabasas, CA 91302*

Scheme," in which they intend to use funds obtained from certain investors to pay off obligations to other investors.

143.    The Ketelhuts have attempted all reasonable means of resolving this matter short of litigation.  In response, Copeland and Villa Fatima have broken promises repeatedly and have left the Ketelhuts with no other option but to seek legal redress as they now do by this Complaint.

**FIRST CAUSE OF ACTION**
**FOR RESCISSION**
**(Against Fatima Life Plan)**

144.    The Ketelhuts incorporate paragraphs 1 through 140 above.

145.    Section 1689(b)(1) of the California Civil Code provides that a party to a contract may rescind the contract "[i]f If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party."

146.    The Ketelhuts consented to execute the March Note, the Developer Agreement, and the April Note in favor of Fatima Life Plan through the fraud and the connivance of Copeland and other officers, and agents of Fatima Life Plan.

147.    A plaintiff establishes a claim for fraud by showing that the defendant (a) made a misrepresentation to the plaintiff (as a false statement, a concealment, or a promise with no intent to perform); (b) knew the misrepresentation to be false or made the misrepresentation with reckless disregard for the truth; (c) intended to induce the plaintiff's reliance on that misrepresentation; (d) that caused the plaintiff to act; and (e) that caused the plaintiff harm.

148.    The Misrepresentations set forth in Subsection K above included knowingly false misrepresentations within the meaning of California Civil Code

39

section 1710(1), concealments within the meaning of California Civil Code section 1710(3), and promises with no intention of performance, within the meaning of California Civil Code section 1710(4).

149.   Copeland knew the Misrepresentations were false or he made them with reckless disregard for the truth.  To the extent the Misrepresentations were, or included, promises of intention of performance, Copeland made those Misrepresentations with no intention of performance.

150.   Copeland intended to induce the Ketelhuts to rely on the Misrepresentations in executing the March Note, the Developer Agreement, and the April Note in favor of Fatima Life Plan.

151.   The Ketelhuts executed the March Note, the Developer Agreement, and the April Note, in reliance on the Misrepresentations.  The Ketelhuts actually and justifiably relied on each of the Misrepresentations in executing those agreements.

152.   The Ketelhuts are entitled to rescission of the March Note, the Developer Agreement, and the April Note, and to a refund of all monies they paid thereunder.

## SECOND CAUSE OF ACTION
### FOR FRAUD
**(Against The Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, and Jamie Griffith)**

153.   The Ketelhuts incorporate paragraphs 1 through 149 above.

154.   Fraud occurs when (1) a defendant represents to the plaintiff that a fact is true; (2) the defendant's representation was false; (3) the defendant knew the representation was false when he or she made it, or she or she made the representation recklessly and without regard for its truth; (4) the defendant

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on defendant's representation; (6) the plaintiff was harmed; and (7) plaintiff's reliance on defendant's representation was a substantial factor in causing the harm.

155.   Defendant Copeland made the Misrepresentations set forth in Subsection K.  He knew those Misrepresentations were false when he made them or he made them recklessly and without regard for their truth.  He intended that the Ketelhuts rely on those representations.  The Ketelhuts reasonably relied on those representations in executing the March Note, the Developer Agreement, and the April Note.  The Ketelhuts were harmed in transferring monies to Fatima Life Plan, and their reliance on Defendant Copeland's representations was a substantial factor in causing the harm.

156.   Defendant Genuis made the Misrepresentations set forth in Subsection K.  He knew those Misrepresentations were false when he made them or he made them recklessly and without regard for their truth.  He intended that the Ketelhuts rely on those representations.  The Ketelhuts reasonably relied on those representations in executing the March Note, the Developer Agreement, and the April Note.  The Ketelhuts were harmed in transferring monies to Fatima Life Plan, and their reliance on Defendant Genuis's representations was a substantial factor in causing the harm.

157.   Defendant Sullivan made the Misrepresentations set forth in Subsection K.  He knew those Misrepresentations were false when he made them or he made them recklessly and without regard for their truth.  He intended that the Ketelhuts rely on those representations.  The Ketelhuts reasonably relied on those representations in executing the March Note, the Developer Agreement, and the April Note.  The Ketelhuts were harmed in transferring monies to Fatima Life

41

**COMPLAINT**

Plan, and their reliance on Defendant Sullivan's representations was a substantial factor in causing the harm.

158.   Because Defendant Copeland, Genuis, and Sullivan acted with oppression, fraud, and malice in making the Misrepresentations as alleged herein, Defendants are jointly and severally liable to the Ketelhuts for punitive damages under section 3294(a) of the California Civil Code.

159.   Because Defendants Copeland, Genuis, and Sullivan acted within the scope of their agency relationships with respect to the Villa Fatima Affiliate Entities, the Villa Fatima Affiliate entities, as well as Defendants Copeland, Genuis, and Sullivan are jointly and severally liable to the Ketelhuts for the loss of their monies under the March Note, the Developer Agreement, and the April Note, as well as for compensatory damages, attorneys' fees, and punitive damages.

160.   Defendant Barbara Copeland promoted investment in Villa Fatima to the Ketelhuts and other individuals.  Because of her relationship as spouse to Defendant Kelly Copeland, and her knowledge of involvement in Villa Fatima operations, on information and belief, Barbara Copeland knew of the Misrepresentations.  She knew the Ketelhuts were relying on the Misrepresentations in making their investment in Villa Fatima, and she undertook no action to warn the Ketelhuts about the Misrepresentations.  Moreover, she has profited, or stands to profit, from the monies the Ketelhuts invested in Villa Fatima.  Accordingly, she is jointly and severally liable for the Ketelhuts' losses in reliance on the Misrepresentations.

161.   Defendant Patrick Copeland promoted investment in Villa Fatima to the Ketelhuts and other individuals.  Because of his relationship as son of Defendant Kelly Copeland, and his knowledge of involvement in Villa Fatima operations, on information and belief, Patrick Copeland knew of the

**COMPLAINT**

Misrepresentations.  He knew the Ketelhuts were relying on the Misrepresentations in making their investment in Villa Fatima, and he undertook no action to warn the Ketelhuts about the Misrepresentations.  In fact, the Ketelhuts wired their monies to his personal bank account.  Patrick Copeland has profited, or stands to profit, from the monies the Ketelhuts invested in Villa Fatima.  Accordingly, he is jointly and severally liable for the Ketelhuts' losses in reliance on the Misrepresentations.

162.    Defendant Jamie Griffith promoted investment in Villa Fatima to the Ketelhuts and other individuals.  Because of her relationship as personal secretary to Defendant Kelly Copeland and the Villa Fatima Affiliate Entities, and her knowledge of involvement in Villa Fatima operations, on information and belief, Jamie Griffith knew of the Misrepresentations.  She knew the Ketelhuts were relying on the Misrepresentations in making their investment in Villa Fatima, and she undertook no action to warn the Ketelhuts about the Misrepresentations.  In fact, the Ketelhuts wired their monies to her personal bank account.  Jamie Griffith has profited, or stands to profit, from the monies the Ketelhuts invested in Villa Fatima.  Accordingly, she is jointly and severally liable for the Ketelhuts' losses in reliance on the Misrepresentations.

### THIRD CAUSE OF ACTION
### FOR VIOLATION OF CALIFORNIA FRANCHISE INVESTMENT LAW
### (Against The Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, R. Michael Mohr, and Patrick Copeland)

163.    The Ketelhuts incorporate paragraphs 1 through 159 above.

164.    Section 31110 of the California Franchise Investment Law ("CFIL") makes it "unlawful for any person to offer or sell any franchise in [California] unless the offer of the franchise has been registered under this part or exempted under Chapter 1 (commencing with Section 31100) of this part."

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

43

**COMPLAINT**

165.   Fatima Life Plan offered to sell an "area franchise" to the Ketelhuts within the meaning of section 31008 of the CFIL when it offered them the Regional Developer Agreement.

166.   Fatima Life Plan did not register the Regional Developer Agreement with the California Commissioner of Business Oversight as required under the CFIL, nor was Fatima Life Plan exempt from so registering it.

167.   Fatima Life Plan offered to sell a "franchise" to the Ketelhuts within the meaning of section 31005 of the CFIL when it offered them the Encinitas Joint Venture.

168.   Fatima Life Plan did not register the Encinitas Joint Venture with the California Commissioner of Business Oversight as required under the CFIL, nor was Fatima Life Plan exempt from so registering it.

169.   Section 31201 of the CFIL makes it "unlawful for any person to offer or sell a franchise in [California] by means of any written or oral communication not enumerated in Section 31200 which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

170.   Fatima Life Plan offered to sell the Regional Developer Agreement to the Ketelhuts by means of written and oral communications that included untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Specifically, Fatima Life Plan made the Misrepresentations to the Ketelhuts as described in Subsection K above.

171.   Fatima Life Plan offered to sell the Encinitas Joint Venture to the Ketelhuts by means of written and oral communications that included untrue

COMPLAINT

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Specifically, Fatima Life Plan made the Misrepresentations to the Ketelhuts as described in Subsection K above.

172.   Section 31300 of the CFIL imposes liability on any "person" who offers or sells a franchise in violation of the CIFL.  Section 31015 defines a "[p]erson" to include an individual, a corporation, a partnership, a limited liability company, or a joint venture.  Section 31301 provides that a "person who violates Section 31201 shall be liable to any person (not knowing or having cause to believe that such statement was false or misleading) who, while relying upon such statement shall have purchased a franchise, for damages. . .."

173.   Section 31302 of the CFIL provides that "[e]very person who directly or indirectly controls a person liable under Section 31300 or 31301, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

174.   Section 31300 of the CFIL also allows a plaintiff to sue for rescission if the violation of the CFIL was "willful."  Proof that a violation was "willful" does not require showing of an intent to violate the law, evil motive, or purpose to gain undue advantage for a plaintiff to obtain a judgment for rescission.

175.   The Misrepresentations to the Ketelhuts as described in Subsection K above were willful.

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

176.    The Ketelhuts are entitled to rescission of the Regional Developer Agreement.

177.    The Ketelhuts are entitled to rescission of the Encinitas Joint Venture. Because the April Note was the vehicle for investment in a franchise under the Encinitas Joint Venture, the Ketelhuts are also entitled to rescission of the April Note.

178.    The Ketelhuts have suffered, and are entitled to recover, damages because of the Misrepresentations that occurred in relation to the Regional Developer Agreement.

179.    Under Section 31302 of the CFIL, the following Defendants are jointly and severally liable to the Ketelhuts for damages in relation to the Regional Developer Agreement:  The Villa Fatima Affiliate Entities, Copeland, Genuis, Sullivan, Mohr, and Patrick Copeland.

180.    The Ketelhuts have suffered, and are entitled to recover, damages because of the Misrepresentations that occurred in relation to the Encinitas Joint Venture.

181.    Under Section 31302 of the CFIL, the following Defendants are jointly and severally liable to the Ketelhuts for damages in relation to the Encinitas Joint Venture:  The Villa Fatima Affiliate Entities, Copeland, Genuis, Sullivan, Mohr, and Patrick Copeland.

182.    Section 31202.5(a) of the CFIL allows a court to issue a temporary and permanent injunction against any person who violates the provisions of the CFIL.

183.    The Ketelhuts are entitled to a temporary and permanent injunction to bar all Defendants from (a) offering for sale any Villa Fatima franchise to be

46

**COMPLAINT**

located in California; and (b) offering for sale to any individual in California any Villa Fatima franchise to be located anywhere.

184.   Under Section 31202.5(a) of the CFIL, the Ketelhuts are entitled to their reasonable attorneys fees.

### FOURTH CAUSE OF ACTION
### FOR CALIFORNIA SECURITIES FRAUD
### (Against The Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, and Michael Sullivan)

185.   The Ketelhuts incorporate paragraphs 1 through 181 above.

186.   A claim for securities fraud is established under section 25401 of the California Corporations Code by showing that the defendant (a) made an offer or sale; (b) of a security; (c) through a misrepresentation of a material fact; (d) that harmed the plaintiff.

187.   The following Defendants made an offer or sale of a security to the Ketelhuts, because they sought their investment of money in the common enterprise of Villa Fatima with the promise of profits that would come solely from the efforts of others:  The Villa Fatima Affiliate Entities (through the representations of Defendants Copeland, Genuis, and Sullivan), as well as Defendants Copeland, Genuis, and Sullivan.

188.   Each of these Defendants Copeland, Genuis, and Sullivan, made this offer or sale through the Misrepresentations.

189.   The Misrepresentations harmed the Ketelhuts, because they executed the March Note, the Developer Agreement, and the April Note, and sent money in relation to these documents.

190.   The following Defendants are subject to section 25401 of the California Corporations Code, because they made offers and sales in California to California citizens:  The Villa Fatima Affiliate Entities (through the representations

47

**COMPLAINT**

of Defendants Copeland, Genuis, and Sullivan), as well as Defendants Copeland, Genuis, and Sullivan.

191.    These Defendants employed "a devise, scheme, or artifice to defraud" the Ketelhuts within the meaning of section 25401 of the California Corporations Code.

192.    These Defendants made "an untrue statement of material fact" or failed "to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading," within the meaning of section 25401 of the California Corporations Code.

193.    These Defendants were engaged "in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person," within the meaning of section 25401 of the California Corporations Code.

194.    The Ketelhuts are entitled to recover from these Defendants the consideration they paid for the March Note, the Developer Agreement, and the April Note, under section 25501 of the California Corporations Code.

195.    The Ketelhuts are entitled to an award of interest against these Defendants at the legal rate under section 25501 of the California Corporations Code.

**FIFTH CAUSE OF ACTION**
**FOR CALIFORNIA BROKER-VIOLATIONS**
**(Against Eric Genuis)**

196.    The Ketelhuts incorporate paragraphs 1 through 192 above.

197.    Section 25501.5(a)(1) of the California Corporations Code provides that "[a] person who purchases a security from or sells a security to a broker-dealer that is required to be licensed and has not, at the time of the sale or purchase, applied for and secured from the commissioner a certificate under Part 3 (commencing with Section 25200), that is in effect at the time of the sale or

48

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

purchase authorizing that broker-dealer to act in that capacity, may bring an action for rescission of the sale or purchase or, if the plaintiff or the defendant no longer owns the security, for damages."

198.   In providing Villa Fatima a total of $450,000 under the March Note, the Developer Agreement, and the April Note, the Ketelhuts had purchased a security in Fatima Life Plan and the Villa Fatima Affiliate Entities within the meaning of section 25019 of the California Corporations Code.

199.   Section 25004 of the California Corporations Code defines a "broker-dealer" to include "any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account."  Receipt of a "finder's fee" is a transaction for one's own account.

200.   Section 1029.8 of the California Code of Civil Procedure provides that an individual who is a "broker-dealer" within the meaning of section 25004 of the California Corporations Code who causes damage to another person as a result of performing broker-dealer services to another shall be liable for treble damages assessed in a civil action, including attorney's fees.

201.   Defendant Genuis was a broker-dealer within the meaning of section 25004 of the California Corporations Code, because he was selling securities for Fatima Life Plan and the Villa Fatima Affiliate Entities for his own account and received a "finder's fee" for his sales activity.

202.   On information and belief, Defendant Genuis had not secured from the California Corporation Commission a "certificate" under section 25200 et seq. of the California Corporations Code when he sold the Ketelhuts a security in Fatima Life Plan.

203.   The Ketelhuts are entitled to rescission of the sale of the security in Fatima Life Plan.

49

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

204.   The Ketelhuts are entitled to the consideration they paid for the security in Fatima Life Plan. They are also entitled to treble damages of that consideration.

205.   The Ketelhuts are entitled to an award of reasonable attorneys fees under section 25501.5 of the California Corporations Code.

## SIXTH CAUSE OF ACTION
## FOR VIOLATIONS UNDER SECTION 10B-5
### (Against The Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith)

206.   The Ketelhuts incorporate paragraphs 1 through 202 above.

207.   Rule 10b-5, promulgated by the U.S. Securities and Exchange Commission ("SEC") under Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), prohibits fraudulent conduct in connection with the sale and purchase of securities.  15 U.S.C. § 78j.  Rule 10b-5 provides that it is unlawful for any person directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security

208.   The Ketelhuts investment of monies in Villa Fatima through the March Note, the Developer Agreement, and the April Note were transactions in connection with the sale and purchase of securities under the anti-fraud provisions of the Exchange Act.

**COMPLAINT**

209.   Defendants Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith violated the provisions of Rule 10b-5 when they made, or allowed to be made, the Misrepresentations in connection with the Ketelhuts' investment of monies in Villa Fatima.

210.   The Ketelhuts are entitled to rescission of the March Note, the Development Agreement, and the April Note, and to the return of all monies paid in relation to the same.

211.   Defendants Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith are jointly and severally liable for all damages awardable under Rule 10b-5.

## SEVENTH CAUSE OF ACTION
## FOR UNFAIR BUSINESS PRACTICES
### (Against The Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith)

212.   The Ketelhuts incorporate paragraphs 1 through 208 above.

213.   Section 17203 of the California Business and Professions Code provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Section 17200 of that Code defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice."

214.   A violation of section 17200 et seq. of the California Business and Professions Code may be predicated on the violation of any state or Federal law. As alleged herein, Defendants' activities in offering for sale, and selling, Villa Fatima Franchise facilities and other investment opportunities violates Federal

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

51

**COMPLAINT**

anti-fraud securities laws, California common law, section 25401 et seq. of the California Corporations Code, and Section 31110 of the CFIL.  Defendants' conduct, as alleged herein, has been, and continued to be unfair, unlawful, and harmful to Plaintiff, and to the general public.  Defendants' activities, as alleged herein, constitute unlawful business acts and practices in violation of section 17200 et seq. of the California Business and Professions Code.

215.   The Villa Fatima Affiliate Entities, as well as Defendants Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith have been offering, and continue to offer, ownership interests in Villa Fatima to citizens of California.  The Ketelhuts and other citizens of California have been personally injured by these Defendants' unlawful business acts and practices as alleged herein, including but not limited to, the loss of money or property.

216.   Under section 17200 et seq. of the California Business and Professions Code, the Ketelhuts are entitled to restitution of the monies withheld and retained by the Villa Fatima Affiliate Entities or by Defendants Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith.

217.   Because these Defendants' activities have injured, and are likely to continue injuring, California citizens, the Ketelhuts are entitled to injunctive relief against these Defendants to bar them from offering for sale, and selling, Villa Fatima Franchise facilities, or other Villa Fatima investment opportunities, in California.

218.   Because the Ketelhuts seek to enforce important rights affecting the public interest within the meaning of section 1021.5 of the California Code of Civil

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

Procedure, the Ketelhuts are entitled to an award of attorneys' fees against these Defendants.

### EIGHTH CAUSE OF ACTION
### FOR UNJUST ENRICHMENT
### (Against All Defendants)

219.    The Ketelhuts incorporate paragraphs 1 through 215 above.

220.    Under California law, no person should be allowed to profit at another's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained.

221.    The following Defendants have been allowed to profit at the Ketelhuts' expense by retaining the monies the Ketelhuts paid in relation to the March Note, the Developer Agreement, and the April Note:  The Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith.

222.    On information and belief, the Copeland-Related Entities and Defendants Edward C. Slowik, Robert A. Leon, and Dale D. Pelton have been allowed to profit at the Ketelhuts' expenses by retaining some portion of monies the Ketelhuts paid in relation to the March Note, the Developer Agreement, and the April Note, because of their close association with the Villa Fatima Affiliate Entities and Kelly Copeland.

223.    The Ketelhuts are entitled to restitution for all monies these Defendants have received from the Ketelhuts in their tender of funds in relation to the March Note, the Developer Agreement, and the April Note.

### PRAYERS FOR RELIEF

WHEREFORE PLAINTIFFS JEFF KETLEHUT AND MARCELLA KETELHUT pray for judgment against the Defendants as follows:

ON THE FIRST CAUSE OF ACTION FOR RESCISSION:

53

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

1.      An order of rescission regarding the March Note, the Developer Agreement, and the April Note;

2.      An order directing Defendant Fatima Life Plan to refund all monies paid under the March Note, the Developer Agreement, and the April Note, to the Ketelhuts;

3.      Loss of interest and other amounts to be proven at trial;

4.      An order making Copeland and the Villa Fatima Entities jointly and severally liable for all amounts owed the Ketelhuts under this Cause of Action.

5.      Such other relief as is just and proper.

ON THE SECOND CAUSE OF ACTION FOR FRAUD:

1.       An amount equal to what the Ketelhuts paid Defendant Fatima Life Plan under the March Note, the Developer Agreement, and the April Note;

2.      Loss of interest and other amounts to be proven at trial;

3.      Punitive damages;

4.      Such other relief as is just and proper.

ON THE THIRD CAUSE OF ACTION FOR VIOLATIONS OF THE CALIFORNIA FRANCHISE INVESTMENT LAW:

1.      An order of rescission regarding the Developer Agreement;

2.      An order of rescission regarding the Encinitas Joint Venture and the April Note;

3.      An order finding Defendants Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, R. Michael Mohr, and Patrick Copeland jointly liable for all damages arising under the Developer Agreement;

4.      An order finding Defendants Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, R. Michael Mohr, and Patrick Copeland

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

54

**COMPLAINT**

jointly liable for all damages arising under the Encinitas Joint Venture and the April Note;

5.     An order permanently enjoining these Defendants from offering for sale any Villa Fatima franchise to be located in California;

6.     An order permanently enjoining these Defendants from offering for sale to any individual in California any Villa Fatima franchise to be located anywhere;

7.     An award of attorneys' fees;

8.     Prejudgment interest;

9.     Such other relief as is just and proper.

ON THE <u>FOURTH CAUSE OF ACTION</u> FOR CALIFORNIA SECURITIES FRAUD:

1.     The consideration they paid for the March Note, the Developer Agreement, and the April Note;

2.     An award of interest at the legal rate under section 25501 of the California Corporations Code;

3.     Such other relief as is just and proper.

ON THE <u>FIFTH CAUSE OF ACTION</u> FOR BROKER DEALER VIOLATIONS:

1.     Rescission of the March Note, the Developer Agreement, and the April Note;

2.     Compensatory damages in the amount of all monies paid under the March Note, the Developer Agreement, and the April Note;

3.     Treble damages;

4.     Prejudgment interest;

5.     Attorney's fees;

**COMPLAINT**

The Alvarez Firm, a Law Corp.
24005 Ventura Blvd.
Calabasas, CA 91302

6.      Such other relief as is just and proper.

ON THE <u>SIXTH CAUSE OF ACTION</u> FOR 10B-5 VIOLATIONS:

1.      Rescission of the March Note, the Developer Agreement, and the April Note;

2.      Damages in the amount of all monies paid under the March Note, the Developer Agreement, and the April Note;

3.      Prejudgment interest;

4.      Such other relief as is just and proper.

ON THE <u>SEVENTH CAUSE OF ACTION</u> FOR UNFAIR BUSINESS PRACTICES:

1.      Restitution of the monies withheld and retained by each of the Defendant Villa Fatima Affiliate Entities or by Defendants Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith;

2.      A permanent injunction barring Defendants Villa Fatima Affiliate Entities, Kelly Copeland, Eric Genuis, Michael Sullivan, Barbara Copeland, Patrick Copeland, R. Michael Mohr, and Jamie Griffith, from offering for sale, and selling, Villa Fatima Franchise facilities, or other Villa Fatima investment opportunities, in California;

3.      An award of attorneys' fees under section 1021.5 of the California Code of Civil Procedure.

4.      Prejudgment interest;

5.      Such other relief as is just and proper.

ON THE <u>EIGHTH CAUSE OF ACTION</u> FOR UNJUST ENRICHMENT:

**COMPLAINT**

1.     Restitution for all such monies each Defendant has retained that arose from monies the Ketelhuts paid under the March Note, the Developer Agreement, and the April Note.

2.     Such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

The Ketelhuts hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

**DATED:  November 24, 2014**       **THE ALVAREZ FIRM**

**_____/s/ David A. Shaneyfelt_____**
**David A. Shaneyfelt**
**Attorney for Jeff Ketelhut and Marcella Ketelhut**

**COMPLAINT**

The Alvarez Firm, a Law Corp.
2405 Ventura Blvd.
Calabasas, CA 91302

# EXHIBIT A

Dated: March 19, 2014

## CONVERTIBLE PROMISSORY NOTE

THIS NOTE AND THE JOINT VENTURE INTO WHICH IT IS CONVERTIBLE ARE NOT SECURITIES AND HAVE NOT BEEN REGISTERED UNDER THE SECRITIES ACT OF 1933 AS AMENDED (THE "ACT"), OR UNDER THE LAWS OF ANY STATE OR OTHER JURISDICTION.  THIS NOTE AND THE JOINT VENTURE MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS THAT TERM IS DEFINED IN REGULATION S UNDER THE ACT), UNLESS THEY ARE REGISTERED UNDER THE ACT AND UNDER THE LAWS OF THE STATES WHERE EACH SALE IS MADE, OR AN EXEMPTION FROM REGISTRATION REQUIREMENTS IS AVAILABLE IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY.

**FOR VALUE RECEIVED**, Fatima Life Plan, Inc., an Arizona corporation (the "Maker"), hereby promises to pay to Jeffrey and Marcella Ketelhut (the "Holder") at the address of 36 Pinecrest Drive, Thousand Oaks, California, 91361 the principal amount of Fifty Thousand and NO/100 Dollars ($50,000.00) (the "Principal"), with no interest on the principal balance outstanding hereunder, from the date hereof until the date that is five years from the date of this Convertible Promissory Note (the "Maturity Date"), at the interest rate specified below.

In addition to the foregoing the following terms and conditions shall apply to this Convertible Promissory Note (this "Note").

## ARTICLE 1 - PAYMENT OF INTEREST AND PRINCIPAL

1.1   **Accrual and Payment of Interest.**  Interest at the rate of zero percent (0%) per annum will accrue on the Principal.  No interest shall accrue during the Term hereof and Maker shall have no obligation to pay any interest on the Maturity Date or anytime sooner.

1.2   **Payment of Principal.**   In the event that the Holder does not exercise its Conversion Privileges as provided in Section 2.1, Maker will pay to the Holder the total Principal of the Note on the Maturity.

## ARTICLE 2 – CONVERSION RIGHTS

2.1   **Holder Option to Convert.**   At any time during the term of this Note, Holder, at Holder's sole discretion, will have the right to convert this Note into a Joint Venture Position in any Joint Venture opportunity presented by Maker to Holder per dollar of Principal then outstanding under this Note by delivering written notice of its election along with the surrender of this originally executed Note.

3690476v1/99-8818

2.2 **Liquidation Preference.** In the event of any liquidation or winding up of Maker, Holder will be entitled to receive, on a pari passu basis with any other Convertible Promissory Note holders, and in preference to the holders of any equity interests in the Maker, an amount equal to the outstanding amount of this Note.

2.3 **Adjustment.** This Note can be converted by the Holder only in its entirety, not in part, and by the surrender of this Note at the principal office of Maker.

## ARTICLE 3 – REDEMPTION

3.1 **Redemption.** Upon 30 business days' written notice to the Holder by Maker after receipt of a Joint Venture Opportunity by Maker, the Holder will have the right to redeem this Note in exchange for the total outstanding amount of this Note at redemption. Holder's rights under this Note will terminate upon redemption.

## ARTICLE 4 – EVENTS OF DEFAULT

4.1 **Default.** The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all principal sum remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon express, written notice and a grace period to cure such Event of Default of not less than 15 days, except as otherwise set forth below:

(a) **Failure to Pay Principal.** Maker fails to pay the Principal of this Note when due and such failure continues for a period of 15 days.

(b) **Breach of Covenant.** Maker breaches any covenant or other term or condition of this Note and such breach continues for a period of 15 days after written notice to Maker from the Holder.

## ARTICLE 5 – MISCELLANEOUS

5.1 **Failure or Indulgency Not Waiver.** No failure or delay on the part of either party hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. All rights and remedies existing hereunder are cumulative to, and not exclusive of any rights or remedies otherwise available.

5.2 **Notices.** Any notice herein required or permitted to be given shall be in writing and may be personally served and shall be deemed to be delivered upon receipt or sent by United States mail and shall be deemed to have been given one day after being deposited in the United States mail, certified, registered, with postage pre-paid and properly addressed or on receipt, or sent by fax transmission or electronic mail transmission (with the original sent by certified or registered mail

or by overnight courier) and shall be deemed to have been delivered on the day telecopied or electronically transmitted.

5.3 **Amendment Provision.** The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemental, then as so amended or supplemented. This Note may only be amended, modified, added to or changed by a writing executed by both Maker and the Holder.

5.4 **Assignability.** This Note shall be binding upon Maker and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns. The Holder may not assign this Note without the express written consent of Maker, which shall not be unreasonably withheld or delayed. Any attempted assignment in contravention hereof shall be null and void.

5.5 **Cost of Collection.** If an Event of Default occurs and the Holder substantially prevails in an action related to such Event of Default, Maker shall pay the Holder's reasonable attorneys' fees.

5.6 **Governing Law and Venue.** This Note has been executed in and shall be governed by the internal laws of the State of Arizona, without regard to the principles of conflict of laws. Venue shall only be in Pima, County Arizona.

IN WITNESS WHEREOF, Maker has caused this Note to be signed in its name as of this *13th* day of March, 2014.

MAKER:
Fatima Life Plan, Inc.

By:_____

Name:_____

Title:_____

**Agreed to and Accepted by Holder:**
HOLDER:
Jeffrey Ketelhut and Marcella Ketelhut

By:_____
Jeffrey Ketelhut

By:_____
Marcella Ketelhut

3690476v1/99-8818                    3

**EXHIBIT B**



**FATIMA LIFE PLAN, INC**

**REGIONAL DEVELOPER AGREEMENT**

# TABLE OF CONTENTS

**SECTION**                                                                      **PAGE**

1. GRANT OF RIGHTS. ...2
2. DEVELOPMENT FEE. ...2
3. REGIONAL DEVELOPER'S DEVELOPMENT OBLIGATION. ...2
   3.1 Regional Developer's Development Obligations, Reference to Exhibit 2. ...2
   3.2 Pilot Franchise. ...3
   3.3 Regional Developer Sales Office. ...3
4. REGIONAL DEVELOPER RIGHTS. ...3
   4.1 Regional Developer Rights. ...3
   4.2 Rights Maintained by Company. ...3
5. TERM. ...4
6. ADDITIONAL OBLIGATIONS OF COMPANY AND REGIONAL DEVELOPER. ...5
   6.1 Pilot Franchise Training. ...5
   6.2 Regional Developer Training. ...5
   6.3 Regional Developer Manual. ...5
   6.4 General Guidance. ...6
   6.5 Franchise Registration and Disclosure. ...6
   6.6 Investigation and Qualification of Prospective Franchisees. ...7
   6.7 Training and Support by Regional Developer. ...8
   6.8 Inspection of Villa Fatima Unit Franchises and Operations. ...8
   6.9 Marketing and Promotion. ...9
   6.10 Identification of Suppliers. ...9
7. OPERATING STANDARDS. ...9
   7.1 Standard of Service. ...9
   7.2 Compliance with Laws and Good Business Practices. ...9
   7.3 Accuracy of Information. ...9
   7.4 Notification of Litigation. ...10
   7.5 Insurance. ...10
   7.6 Proof of Insurance Coverage. ...10
   7.7 Marketing Plan and Local Advertising. ...10
   7.8 National Advertising. ...11
   7.9 Approval of Advertising. ...11
   7.10 Websites. ...11
   7.11 Accounting, Bookkeeping and Records. ...12
   7.12 Reports. ...12
8. PAYMENTS TO REGIONAL DEVELOPER. ...12
   8.1 Regional Developer. ...12
   8.2 Commissions After Termination. ...13
   8.3 Application of Payments. ...13
   8.4 Setoffs. ...13
9. MARKS. ...13
   9.1 Ownership and Goodwill of Marks. ...13
   9.2 Limitations on Regional Developer's Use of Marks. ...14
   9.3 Notification of Infringements and Claims. ...14

|   |   |   |   |
|---|---|---|---|
| | 9.4 | Discontinuance of Use of Marks. | 14 |
| | 9.5 | Indemnification For Use of Marks. | 14 |
| 10. | | CONFIDENTIAL INFORMATION. | 15 |
| 11. | | ASSIGNABILITY. | 16 |
| | 11.1 | Assignability by Company. | 16 |
| | 11.2 | Assignments by Regional Developer. | 17 |
| | 11.3 | Conditions for Approval of Assignment or Transfer. | 18 |
| | 11.4 | Assignment to Entity Principally Controlled By You. | 19 |
| | 11.5 | Death or Disability. | 20 |
| | 11.6 | Company's Right of First Refusal. | 20 |
| | 11.7 | Ownership Structure. | 21 |
| 12. | | NON-COMPETITION. | 21 |
| | 12.1 | In Term. | 21 |
| | 12.2 | Post-Term. | 22 |
| 13. | | TERMINATION. | 22 |
| | 13.1 | Termination by Company. | 22 |
| | 13.2 | Rights and Obligations Upon Termination or Expiration. | 24 |
| 14. | | MEDIATION. | 25 |
| 15. | | GENERAL CONDITIONS AND PROVISIONS. | 25 |
| | 15.1 | Relationship of Regional Developer to Company. | 25 |
| | 15.2 | Indemnification. | 26 |
| | 15.3 | Waiver and Delay. | 26 |
| | 15.4 | Survival of Covenants. | 27 |
| | 15.5 | Successors and Assigns. | 27 |
| | 15.6 | Joint and Several Liability. | 27 |
| | 15.7 | Governing Law. | 27 |
| | 15.8 | Consent to Jurisdiction. | 27 |
| | 15.9 | Waiver of Punitive Damages and Jury Trial. | 28 |
| | 15.10 | Limitation of Claims. | 28 |
| | 15.11 | Entire Agreement. | 28 |
| | 15.12 | Title for Convenience. | 28 |
| | 15.13 | Gender. | 28 |
| | 15.14 | Severability. | 29 |
| | 15.15 | Fees and Expenses. | 29 |
| | 15.16 | Notices. | 29 |
| | 15.17 | Time of Essence. | 30 |
| | 15.18 | Lien and Security Interest. | 30 |
| 16. | | SUBMISSION OF AGREEMENT. | 30 |
| 17. | | ACKNOWLEDGMENTS. | 30 |
| A. | | EXHIBIT 1 | A-1 |
| B. | | EXHIBIT 2 | B-1 |
| C. | | EXHIBIT 3 | C-1 |
| D. | | EXHIBIT 4 | D-1 |
| E. | | EXHIBIT 5 | E-1 |



**FATIMA LIFE PLAN, INC.**

**REGIONAL DEVELOPER AGREEMENT**

THIS REGIONAL DEVELOPER AGREEMENT (the "Agreement") is made and entered into this March 19th, 2014 Feast day of St. Joseph (the "Effective Date"), by and between Fatima Life Plan, Inc., an Arizona corporation ("Company", "we", "us" or "our" or "Villa Fatima"), and Jeffrey A Ketelhut and Marcella T Ketelhut, whose address is 36 Pinecrest Drive Thousand Oaks, California 91361 corporation/limited liability company/partnership (Circle One) (referred to as "Regional Developer", "you" or "your"), with reference to the following facts:

A.   We and our affiliates have designed and developed valuable and proprietary formats and systems for the development and operation of businesses operating   Unit Franchises ("Villa Fatima Unit Franchise(s)") and Regional Developer franchises ("Regional Developer Franchise(s)").  Villa Fatima Unit Franchises offer franchisees the right to open a franchise that specializes in providing both secure dementia care and transitional care in a unique resident-friendly environment with state-of-the-art care practices, and other related products and services.  Villa Fatima Regional Developer Franchises solicit, qualify, train and assist Villa Fatima Unit Franchise owners ("Unit Franchisee(s)").

B.   We have developed and use, promote and license certain trademarks, service marks and other commercial symbols in operating Villa Fatima franchises, including "Villa Fatima," and we may create, use and license other trademarks, service marks and commercial symbols for use in operating Villa Fatima Unit Franchises and  Regional Developer Franchises (collectively, the "Marks").

C.   We offer prospective Unit Franchisees ("Prospective Franchisee(s)") the right to own and operate a Villa Fatima Unit Franchise offering the products and services we authorize (and only the products and services we authorize) and using our business formats, methods, systems, procedures, signs, designs and layouts, standards, specifications and Marks, all of which we may improve, further develop and otherwise modify from time to time (collectively, the "System").

D.   We also offer prospective Regional Developer Franchise owners the right to own and operate a Regional Developer Franchise that will solicit, qualify, train, and assist Unit Franchisees in opening and operating Villa Fatima Unit Franchises within a defined geographic development area (a "Development Area").

E.   Regional Developer desires to become a Regional Developer business (an "RD Business") under which it will solicit, qualify, train and assist Villa Fatima Unit Franchises within the Development Area set forth in Exhibit 1.

F.   We desire to grant to Regional Developer the right to operate an RD Business in accordance with the terms and upon the conditions contained in this Agreement.

WHEREFORE, IT IS AGREED:

1.     GRANT OF RIGHTS.

        Subject to the terms of this Agreement, we hereby grant to Regional Developer a Regional Developer Franchise, and Regional Developer hereby accepts the rights during the Term to open and operate, to solicit, qualify for final approval by us, train, and assist Prospective Franchisees to open and operate Villa Fatima Unit Franchises in the Development Area set forth in Exhibit 1, all in accordance with this agreement.

2.     DEVELOPMENT FEE.     *REFER TO 1ST ADDENDUM Reg. Developer Agreement*

        Regional Developer shall pay to us a non-refundable "Development Fee" ranging from Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) and Nine Hundred Thousand and No/100 Dollars ($900,000.00), payable upon execution of this Agreement.

3.     REGIONAL DEVELOPER'S DEVELOPMENT OBLIGATION.

        3.1   Regional Developer's Development Obligations, Reference to Exhibit 2.

                (a)     Regional Developer shall construct, equip, open and operate a training facility, and solicit, screen, qualify, train and assist Prospective Franchisees to construct, equip, open and operate, within the Development Area, not fewer than the cumulative number of Villa Fatima Unit Franchises set for in Exhibit 2, which is annexed hereto and by this reference made a part hereof, in the manner and within each of the time periods (the "RD Development Period(s)") specified therein (the "RD Minimum Development Obligations"). Upon renewal of Regional Developer's Term, the RD Minimum Development Obligations shall be renegotiated. However, the RD Minimum Development Obligations for the renewal term may not be increased by more than 50%.

                (b)     Each Villa Fatima Unit Franchise shall be the subject of a separate Franchise Agreement (as defined herein). We and Regional Developer or the Unit Franchisee shall enter into our then-current form of franchise agreement (the "Franchise Agreement"); provided, however, that Regional Developer shall not be required to pay an initial franchise fee under the Franchise Agreement for the Pilot Franchise (defined below).

                (c)     Villa Fatima Unit Franchises that are the subject of a Franchise Agreement executed pursuant hereto, whether by Regional Developer or by a Unit Franchisee, shall be counted in determining whether the RD Minimum Development Obligations shall have been met within the applicable RD Development Periods.

3.2     Pilot Franchise.

Regional Developer is required to sign a Franchise Agreement and open one (1) Villa Fatima Unit Franchise within the Development Area that successfully passes our operational review, to be used as a prototype business and training facility (the "Pilot Franchise"). The Regional Developer is required to open its Pilot Franchise following the same time frame as other Villa Fatima Unit Franchises as provided in the Franchise Agreement. The Pilot Franchise will be used to provide training and assistance to any Unit Franchisees in the Development Area. Regional Developer will operate the Pilot Franchise or any replacement thereof at all times during the Term and any extension of it. The Pilot Franchise must be located at a site within the Development Area that is suitable for the operation of a Villa Fatima Unit Franchise ("the Pilot Franchise Site"). The Regional Developer Sales Office may be located on the same site as the Pilot Franchise. The Pilot Franchise Site is subject to the same approval process as any other Villa Fatima Unit Franchise site as specified in the Franchise Agreement.

3.3     Regional Developer Sales Office.

Regional Developer shall establish and operate a franchise sales office ("Regional Developer Sales Office" or "Sales Office") within the Development Area, which may be the same as the Pilot Franchise Site. We will not approve or disapprove the location of the Sales Office.

4.      REGIONAL DEVELOPER RIGHTS.

4.1     Regional Developer Rights.

Except as provided in Section 4.2, as long as this Agreement is in effect, and you are in compliance with this Agreement, and meet the RD Minimum Development Obligations set forth in this Agreement, then we and our affiliates will not operate, establish or grant in your Development Area another Regional Developer Franchise offering Villa Fatima Unit Franchises.

4.2     Rights Maintained by Company.

We (and any affiliates that we might have from time to time) shall at all times have the right to engage in any activities we deem appropriate that are not expressly prohibited by this Agreement, whenever and wherever we desire, including, but not limited to:

(a)     establish and operate Villa Fatima Unit Franchises and Regional Developer Franchises, and grant the right to other persons to establish and operate Villa Fatima Unit Franchises or Regional Developer Franchises, on any terms and conditions we deem appropriate and at any locations other than in your Development Area;

(b)     establish Villa Fatima Unit Franchises and grant the right to other persons to solicit, qualify, train and assist Villa Fatima Unit Franchises, on any terms and conditions we deem appropriate and at any locations within the Development Area, provided however, that Regional Developer will be entitled to its share of the Initial Commissions and any Royalty Fees, as set forth more specifically in Section 8 of this Agreement;

(c)     provide and grant rights to other persons to provide goods and services similar to and/or competitive with those provided by Villa Fatima Unit Franchises to customers located within a Territory and/or Development Area, whether identified by the Marks or other trademarks or service marks, through any distribution channel other than Villa Fatima Unit Franchises located within a Territory and/or Development Area (including, but not limited to, sales of products or services via mail order, catalogs, toll-free telephone numbers and electronic means including the Internet);

(d)     provide and grant rights to other persons to provide goods and services dissimilar to and/or not competitive with those provided by Villa Fatima Unit Franchises to customers located within a Territory and/or Development Area, including but not limited to, franchise concepts and other related products;

(e)     acquire the assets or ownership interest of one or more businesses providing products and services similar to those provided at Villa Fatima Unit Franchises, and franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating, including within a Development Area but not within the Territory of an existing Villa Fatima Unit Franchise;

(f)     be acquired (regardless of the form of transaction) by a business providing products and services similar to those provided at Villa Fatima Unit Franchises, or by another business, even if such business operates, franchises and/or licenses competitive businesses within a Territory and/or Development Area; and

(g)     use alternative channels of distribution within a franchisee's territory, including Internet, catalog, or telemarketing sales under the Villa Fatima Unit Franchise Agreement.

5.     TERM.

The term of this Agreement (the "Term") shall be for a period of fifteen (15) years commencing on the Effective Date, unless sooner terminated in accordance with the provisions of Section 13.  Regional Developer shall have the right to extend the Term for two (2) additional periods of ten (10) years each if (i) Regional Developer has substantially complied with the RD Minimum Development Obligation, and all of the other terms of this Agreement during the Term; (ii) Regional Developer and all of its owners and their spouses sign our general release form; (iii) we and Regional Developer mutually agree on a new minimum or other development obligations for the Development Area for the extension period; and (iv) Regional Developer has paid a renewal fee amounting to one third (1/3) of the then current initial unit franchise fee per Villa Fatima Unit Franchise operating in its Development Area.  Under the general release, Regional Developer and its owners and their spouses will waive any and all claims against us, our affiliates, and our and their owners, officers, directors, employees, agents, successors and assigns.  If Regional Developer wishes to extend the Term, Regional Developer must notify us in writing between nine (9) and twelve (12) months before the Term would otherwise expire.

*1/3 of $49,500*

*Not Applicable* 6. <u>ADDITIONAL OBLIGATIONS OF COMPANY AND REGIONAL DEVELOPER.</u>

6.1     Pilot Franchise Training.

Prior to the opening of a Pilot Franchise, we or our designee shall provide Regional Developer with our initial training program and opening assistance for Villa Fatima Unit Franchises pursuant to the terms of the Franchise Agreement for the Pilot Franchise. The Franchise Agreement for each Unit Franchise opened by Regional Developer after the Pilot Franchise shall provide that Regional Developer will receive from us only the classroom training portion of our initial training program, and shall not provide on-site assistance to the Regional Developer for its Unit Franchise.

6.2     Regional Developer Training.

No later than forty-five (45) days before you open your Regional Developer Franchise for business, we or our designee will provide up to two (2) days of training to Regional Developer on the operation of an RD Business. This training program may include classroom training and/or hands-on training and will be conducted in Mesa, Arizona, and/or at any other location(s) we designate. Regional Developer must complete the initial training to our satisfaction and participate in all other activities we require before soliciting Prospective Franchisees in the Development Area. Additionally, Regional Developer is responsible for all attendees' out-of-pocket expenses in connection with all training programs, including costs and expenses of transportation, lodging, meals, wages and employee benefits.

If we determine that Regional Developer cannot complete the initial training to our satisfaction, we may, at our option, either (1) require Regional Developer to attend additional training at Regional Developer's expense (for which we may charge reasonable fees), or (2) terminate this Agreement.

If we, in our sole discretion, determine that any General Manager or employee whom we require to attend any initial training program is unable to satisfactorily complete such program, then you must not hire that person, and must hire a substitute General Manager or employee (as the case may be), who must enroll in the initial training program within fifteen (15) days thereafter, and complete the initial training to our satisfaction.

Regional Developer shall participate in periodic webinars and sales calls scheduled by us for Regional Developer Franchises, and attend a national business meeting or convention of up to three days each year. We may also require Regional Developer to attend up to seven (7) days of additional or refresher training courses each year. We may charge reasonable fees for these courses, conventions, webinars, sales calls, and programs. Regional Developer is responsible for all travel and living expenses.

6.3     Regional Developer Manual.

        (a)     We shall loan to Regional Developer one (1) copy of our Manual for Regional Developers (the "Regional Developer Manual") and one (1) copy of our Operations Manual for Villa Fatima Unit Franchises ("Unit Manual") (collectively referred to as the "Manuals"). Regional

Developer shall conduct all business activities in strict accordance with our standard operational methods and procedures as prescribed from time to time in the Manuals.  As used in the Agreement, the term "Manuals" shall be deemed to include the Manuals so delivered to Regional Developer, all amendments to the Manuals, and all supplemental bulletins, notices and memoranda which prescribe standard methods or techniques of operation, and which we may from time to time deliver to Regional Developer.

(b)     We shall have the right to modify or supplement the Manuals.  Such modifications and supplements shall be effective and binding on Regional Developer fifteen (15) days after notice thereof is mailed or otherwise delivered to Regional Developer.  Regional Developer acknowledges and agrees that modifications of, and supplements to, the Manuals may obligate Regional Developer to invest additional capital or incur higher operating costs.

(c)     The Manuals are our property and may not be duplicated, copied, disclosed or disseminated in whole or in part in any manner except with our express prior written consent.  Regional Developer shall maintain the confidentiality of the Manuals.  Upon the termination of this Agreement, Regional Developer shall return to us all copies of the Manuals in its possession or control.  If Regional Developer's copy of the Manuals is lost, destroyed or significantly damaged, Regional Developer agrees to obtain a replacement copy at our then-applicable charge.

6.4     General Guidance.

We will provide guidance to Regional Developer in the Manuals and other bulletins or other written materials, by electronic media, and/or by telephone consultation.  If Regional Developer requests and we agree to provide additional or special guidance, assistance or training, Regional Developer must pay our then-applicable charges, including our personnel's per diem charges and any travel and living expenses.

6.5     Franchise Registration and Disclosure.

Neither Regional Developer nor any representative of Regional Developer shall solicit Prospective Franchisees of Villa Fatima Unit Franchises (1) until we have registered our current Franchise Disclosure Document in applicable jurisdictions in the Development Area and have provided Regional Developer with the requisite documents, or (2) at any time when we notify Regional Developer that our registration is not then in effect or our documents are not then in compliance with applicable law.  If Regional Developer's activities pursuant to this Agreement require the preparation, amendment, registration, or filing of information or any disclosure or other documents, then all requisite disclosure documents, ancillary documents, and registration applications shall be prepared and filed by us or our designee, and registration secured, before Regional Developer may solicit Prospective Franchisees for Villa Fatima Unit Franchises.  Costs and legal fees necessary to prepare such registration applicable to Regional Developer shall be borne by Regional Developer.  In particular, Regional Developer shall:

(a)     prepare and forward to us verified financial statements of Regional Developer in such form and for such periods as shall be designated by us, including audited financial statements, if necessary and appropriate to comply with applicable legal disclosure, filing or other legal requirements;

(b)      promptly provide all information reasonably required by us to prepare all requisite disclosure documents and ancillary documents for the offering of franchises throughout the Development Area; and

(c)      execute all documents required by us for the purpose of registering Regional Developer and us to offer franchises throughout the Development Area.

Regional Developer agrees to review all information pertaining to Regional Developer prepared to comply with legal requirements for selling franchises in the Development Area and verify its accuracy if so requested by us.  Regional Developer acknowledges that we and our affiliates and designees shall not be liable to Regional Developer for any errors, omissions or delays which occur in the preparation of such materials.

6.6      Investigation and Qualification of Prospective Franchisees.

(a)      Each Villa Fatima Unit Franchise opened by a Unit Franchisee pursuant to this Agreement shall be the subject of a separate Franchise Agreement with us, in our then-current form.   Regional Developer shall have no right to modify or offer to modify any Franchise Agreement or other contract.

(b)      If we approve a Prospective Franchisee and a prospective Villa Fatima Unit Franchise location, Regional Developer shall transmit to such Unit Franchisee for execution copies of our then-current Franchise Agreement pertaining to the approved site and providing for the territory associated with said Villa Fatima Unit Franchise, as determined by us.

(c)      Regional Developer shall investigate the qualifications of each Prospective Franchisee and the suitability of each prospective Villa Fatima Unit Franchise location in the Development Area in accordance with our standards, policies and procedures relating to qualification of Unit Franchisees then in effect, and shall obtain all information required of Prospective Franchisees by us.

(d)      After Regional Developer is satisfied that a Prospective Franchisee meets the standards established by us, Regional Developer may recommend to us the approval of such Prospective Franchisee.  Regional Developer shall then furnish to us all information relating to the Prospective Franchisee which shall be required by us in the form and manner customarily required by us.

(e)      We may thereafter conduct or obtain such credit reports and background checks on Prospective Franchisees as we deem necessary or convenient.  We may then approve or disapprove a Prospective Franchisee for any reason and may seek further information with respect to the Prospective Franchisee.  Regional Developer shall cooperate with us in any further investigation of the Prospective Franchisee.  If we reject a Prospective Franchisee, we shall provide Regional Developer with an explanation of the reasons therefor.

(f)     Regional Developer shall deliver to us a copy of all correspondence with Unit Franchisees which is material to the franchise relationship, concurrently with its being sent or received by Regional Developer.

(g)     If we approve a Prospective Franchisee that was referred to us by Regional Developer and the feasibility study/appraisal for Prospective Franchisee's proposed Unit Franchise site within Regional Developer's Development Area is negative (as explained in the Franchise Disclosure Document) or the responsible state agency does not issue the certificate of need (in states where such issuance is required) for the proposed Unit Franchise site or Territory, then we will use our best efforts to locate another proposed Unit Franchise site for the Prospective Franchisee within Regional Developer's Development Area. If we are unable to locate another acceptable Unit Franchise site within Regional Developer's Development Area, we have the right to offer another acceptable Unit Franchise site to Prospective Franchisee outside of Regional Developer's Development Area (including within another regional developer's development area) without additional compensation to Regional Developer except for his Initial Fee Commission as set forth in Section 8.1 below.

6.7     Training and Support by Regional Developer.

Regional Developer agrees to implement any training programs developed by us for Villa Fatima Unit Franchises and to provide such assistance and services as we shall reasonably request and require from time to time in connection with the (1) construction, equipping and opening of Villa Fatima Unit Franchises established by Regional Developer within the Development Area, (2) the sourcing of equipment, fixtures, furnishings, inventory and supplies for Villa Fatima Unit Franchises, (3) the advertising and promotion of Villa Fatima Unit Franchises, and (4) the supervision and compliance with our quality control standards in the use of the Marks at Villa Fatima Unit Franchises. Regional Developer will act as a supervisor for the opening of each Villa Fatima Unit Franchise and will be on site at the Unit Franchise to assist Unit Franchisee with operational efficiency, staff training, franchise setup and grand opening for the first two (2) days of the Franchise's operation. All services and assistance provided to Unit Franchisees in connection with the operation of Villa Fatima Unit Franchises located in the Development Area, and which are established by the Regional Developer, will be provided by Regional Developer, and such obligations of Regional Developer will not be transferred, delegated or subcontracted to any other person.

6.8     Inspection of Villa Fatima Unit Franchises and Operations.

Regional Developer shall conduct inspections of all Villa Fatima Unit Franchises in the Development Area, and the review of the operations of all Villa Fatima Unit Franchises in the Development Area, in accordance with the standards from time to time established by us, upon such schedules and according to such procedures as shall be agreed upon by us and Regional Developer, acting in good faith, but, in any event, at least once per month. Regional Developer shall provide reports to us with respect to the findings of such inspections, in such form and at such time as we shall require.

Not Applicable

6.9   Marketing and Promotion.

Regional Developer shall participate in all promotion and marketing activities required by us or our Regional Developers, as required in this Agreement, the Franchise Agreements, the Franchise Disclosure Document or otherwise.

6.10   Identification of Suppliers.

Regional Developer agrees to cooperate with us to identify supplier(s) to deliver products to Villa Fatima Unit Franchise customers within the Development Area, if requested.

7.   OPERATING STANDARDS.

7.1   Standard of Service.

Regional Developer shall at all times give prompt, courteous and efficient service to Villa Fatima Unit Franchises in the Development Area.  Regional Developer shall, in all dealings with Unit Franchisees, Prospective Franchisees and the public, adhere to the highest standards of honesty, integrity, fair dealings and ethical conduct.

7.2   Compliance with Laws and Good Business Practices.

Regional Developer shall secure and maintain in force all required licenses, permits and certificates relating to Regional Developer's activities under this Agreement and operate in full compliance with all applicable laws, ordinances and regulations.  Regional Developer acknowledges being advised that many jurisdictions have enacted laws concerning the advertising, sale, renewal and termination of, and continuing relationship between parties to a franchise agreement, including, without limitation, laws concerning disclosure requirements.  Regional Developer agrees promptly to become aware of, and to comply with, all such laws and legal requirements in force in the Development Area and to utilize only disclosure documents that we have approved for use in the applicable jurisdiction.

7.3   Accuracy of Information.

Before it solicits any Prospective Franchisee, Regional Developer shall each time take reasonable steps to confirm that the information contained in any written materials, agreements and other documents related to the offer or sale of franchises is true, correct and not misleading at the time of such offer or sale and that the offer or sale of such franchise will not at that time be contrary to, or in violation of, any applicable state law related to the registration of the franchise offering.  We shall provide Regional Developer with any changes to our disclosure documents and other agreements on a timely basis and, upon request, provide Regional Developer with confirmation that the information contained in any written materials, agreements or documents being used by Regional Developer are true, correct and not misleading, except for information specifically relating to disclosures regarding Regional Developer.  If Regional Developer notifies us of an error in any information in our documents, we shall have a reasonable period of time to attempt to correct any deficiencies, misrepresentations or omissions in such information.

7.4     Notification of Litigation.

Regional Developer shall notify us in writing within five (5) days after the commencement of any action, suit, arbitration, proceeding, or investigation, or the issuance of any order, writ, injunction, award and decree, by any court agency or other governmental instrumentality, which names Regional Developer or any of its Owners or otherwise concerns the operation or financial condition of Regional Developer, the RD Business or any Unit Franchisee.

7.5     Insurance.

Regional Developer shall at all times during the term of this Agreement maintain in force, at Regional Developer's sole expense, insurance for the RD Business of the types, in the amounts and with such terms and conditions as we may from time to time prescribe in the RD Manual, or otherwise.   All of the required insurance policies shall name us, and affiliates designated by us, as additional insured, contain a waiver of the insurance company's right of subrogation against us and the designated affiliates, and provide that we will receive thirty (30) days' prior written notice of termination, expiration, cancellation or modification of any such policy.  If you choose to operate a Pilot Franchise, you must also maintain all insurance coverage as prescribed in the Franchise Agreement and the Operations Manual.  *D &O Policy prior to 1st office close*  *ML*

7.6     Proof of Insurance Coverage.

Regional Developer will provide proof of insurance to us before beginning operations of its RD Business.  This proof will show that the insurer has been authorized to inform us in the event any policies lapse or are cancelled or modified.  We have the right to change the types, amount and terms of insurance that Regional Developer is required to maintain by giving Regional Developer prior reasonable notice.  Noncompliance with these insurance provisions shall be deemed a material breach of this Agreement, and in the event of any lapse in insurance coverage, we shall have the right, in addition to all other remedies, to demand that Regional Developer cease operations of its RD Business until coverage is reinstated or, in the alternative, to pay any delinquencies in premium payments and charge the same back to Regional Developer.

7.7     Marketing Plan and Local Advertising.

*Not Applicable ML*

(a)     If we decide to establish one, you are required to join and participate (as the owner of a Villa Fatima Pilot Franchise) in the Advertising Cooperative ("Co-op"), which is an association of all Villa Fatima Unit Franchises and Pilot Franchises located within your Area of Dominant Influence ("ADI").  An ADI is a geographic market designation that defines a broadcast media market, consisting of all counties in which the home market stations receive a preponderance of viewing.  One function of the Co-op is to establish a local advertising pool, of which the funds must be used for Villa Fatima Unit Franchise advertising only and for the mutual benefit of each Co-op member.  Regional Developer must contribute to the pool in accordance with the rules and regulations of the Co-op, as determined by its members, up to a maximum of 1% of its Villa Fatima Pilot Franchise's Gross Revenue.  Amounts contributed to the advertising pool by a Regional Developer may be considered as spent for local advertising, and therefore toward the minimum local advertising requirement.  We may require Regional Developer to administer the Co-op in which ADI its Franchise is located.

(b)     Regional Developer must also lists its Villa Fatima Pilot Franchise in the principal regular (white pages) and the principal classified (yellow pages) telephone directories distributed within your Territory, in such directory categories as are specified by the Company, as set forth in the Manuals, utilizing the Company's standard forms of listing and classified directory advertisement.  Classified directory advertisements must list all other Villa Fatima Unit Franchises operating within the distribution area of the classified directories.  The cost of such advertisements is required to be reasonably apportioned among all Villa Fatima Unit Franchises and Pilot Franchises listed therein.  The costs incurred in such telephone directory advertising may be considered as part of the minimum local advertising expenditure amount, if applicable.

7.8     National Advertising.

We require Regional Developers to participate in a National Advertising Fund, which we reserve the right to create by notifying the Regional Developer with thirty (30) days prior written notice.  We currently do not collect an Ad Fund fee from you at this time, but reserve the right to do so in the future.  If a National Advertising Fund is created, we will require you to pay to the National Advertising Fund up to half percent (0.5 %) of the monthly Gross Revenues of your Regional Developer Franchise and Pilot Franchise and we will provide you with marketing materials and services paid for by the National Advertising Fund.

7.9     Approval of Advertising.

Prior to their use by Regional Developer, samples of all advertising and promotional materials not prepared or previously approved by us shall be submitted to us for approval, which approval shall not be unreasonably withheld.  Regional Developer shall not use any advertising or promotional materials that we have not approved or have disapproved.  Regional Developer acknowledges and understands that certain states require the filing of franchise sales advertising materials with the appropriate state agency prior to dissemination.  Regional Developer agrees to timely comply with such filing requirements at Regional Developer's own expense unless such advertising has been previously filed with the state by us.  We may charge Regional Developer for the costs incurred by us in printing large quantities of advertising and marketing materials supplied by us to Regional Developer at Regional Developer's request.

7.10    Websites.

As used in this Agreement, the term "Website" means an interactive electronic document contained in a network of computers linked by communications software that refers to Villa Fatima Unit Franchises or Villa Fatima Regional Developer Franchises or the Marks.  The term "Website" includes, but is not limited to, Internet, World Wide Web pages and social media pages.  Regional Developer shall not establish a Website or social media pages separate from our Website or social media pages.  We shall have the right, but not the obligation, to designate one or more web page(s) to describe Regional Developer, such web pages(s) to be located within our Website.  Regional Developer may submit to us for our approval samples of the proposed content relating to the Regional Developer for posting on our website.  We have sole and complete discretion over the content of our websites and have no obligations to include any content or information provided by Regional Developer in our website.

7.11    Accounting, Bookkeeping and Records.

Regional Developer shall maintain at its business premises in the Development Area all original invoices, receipts, checks, contracts, licenses, acknowledgement of receipt forms, and bookkeeping and business records we require from time to time.  Regional Developer shall furnish to us, within ninety (90) days after the end of Regional Developer's fiscal year, a balance sheet and profit and loss statement (audited by a CPA, if requested by us) for the RD Business for such year (or a monthly or quarterly statement if required by us, in which case such statements also shall reflect year-to-date information).   In addition upon our request, within ten (10) days after such returns are filed, exact copies of federal and state income, sales and any other tax returns and such other forms, records, books and other information as we periodically require regarding the RD Business, shall be furnished to us.  Regional Developer shall maintain all records and report of the business conducted pursuant to this Agreement for at least four (4) years after the date of termination or expiration of this Agreement.

7.12    Reports.

Regional Developer shall, as often as required by us, deliver to us a written report of its RD Business activities in such form and detail as we may from time to time specify, including information about efforts to solicit Prospective Franchisees, the status of pending transactions and the status of Franchises.

8.    PAYMENTS TO REGIONAL DEVELOPER.

8.1    Regional Developer.

(a)    Initial Fee Commission and Conditions of Payment.   Except as provided below, during the term of this Agreement, Regional Developer shall be paid a commission, as set forth in this Section, based on a percentage of initial franchise fees paid by Unit Franchisees for the purchase of Villa Fatima Unit Franchises located within the Development Area (the "Initial Fee Commission(s)"), subject to fulfillment of the following conditions: (a) the Unit Franchisee executes a Franchise Agreement with us and an initial franchise fee has been paid to and actually received by us (we shall not be deemed to have received any fees paid into escrow, if applicable, until such fees actually have been remitted to us); and (b) Regional Developer has complied with all of its other obligations under this Agreement with respect to such sale and has verified the same to us in writing in a form prescribed by us.  Initial Fee Commissions shall be an amount equal to one-third  (1/3) of the total initial franchise fees paid to us minus any broker's fees or sales commissions, if any, and will be payable to Regional Developer on the last day of the month following the month when the conditions of this Section 8.1 have been fulfilled.

If we reimburse 50% of the Initial Franchise Fee to a Unit Franchisee for the reasons explained in Item 5 of the Franchise Disclosure Document, Regional Developer will be required to reimburse us 50% of its portion of the Initial Franchise Fee that it received for that transaction within ten (10) days of our notice to Regional Developer of our reimbursement to Unit Franchisee.

PAID Quarterly

(b)    Commissions on Royalty Fees.  Except as provided below, we shall pay to Regional Developer, one-sixth (1/6) of the royalty fees (which excludes advertising and marketing fees) actually received by us from each Villa Fatima Unit Franchise located in the Development Area during the applicable period pursuant to their Franchise Agreement ("Royalty Fees"). Commissions earned pursuant to this section will be payable to Regional Developer on the last day of the month following the month when the conditions of this section have been fulfilled. Notwithstanding the foregoing, if Regional Developer has failed to conduct the periodic inspections described in Section 6.8 and failed to perform in any material respect, with respect to one or more Villa Fatima Unit Franchise located in the Development Area for which the Regional Developer is responsible, the other services described in Section 6 to be provided to Villa Fatima Unit Franchises located in the Development Area during any applicable month, then Regional Developer shall not be entitled to receive commissions on Royalty Fees with respect to such Villa Fatima Unit Franchises for the period during which reports or services were not provided.  *PAID QUARTERLY*

8.2    Commissions After Termination.

All payments under this Section 8 shall immediately and permanently cease after the expiration or termination of this Agreement, although Regional Developer shall receive all amounts which have accrued to Regional Developer as of the effective date of expiration or termination.

8.3    Application of Payments.

Our payments to Regional Developer shall be based on amounts actually collected from Unit Franchisees, not on payments accrued, due or owing.  In the event of termination of a Franchise Agreement for a Villa Fatima Unit Franchise within the Development Area, we shall apply any payments received from a Unit Franchisee to pay past due indebtedness of that Villa Fatima Unit Franchise for Royalty Fees, advertising contributions, purchases from us or our affiliates, interest or any other indebtedness to us or our affiliates.  To the extent that such payments are applied to a Villa Fatima Unit Franchise's overdue Royalty Fee payments, Regional Developer shall be entitled to its pro rata share of such payments, less its pro rata share of the costs of collection paid to third parties.

8.4    Setoffs.

Regional Developer shall not be allowed to set off amounts owed to us for fees or other amounts due under this Agreement against any monies owed to Regional Developer by us, which right to set off is hereby expressly waived by Regional Developer.  We shall be allowed to set off against amounts owed to Regional Developer for commissions, Royalty Fees or other amounts due under this Agreement any monies owed to us by Regional Developer.

9.    <u>MARKS</u>.

9.1    Ownership and Goodwill of Marks.

Regional Developer's right to use the Marks is derived only from this Agreement and is limited to Regional Developer's operation of its Regional Developer Business.   Regional Developer's unauthorized use of the Marks is a breach of this Agreement and infringes our rights in the Marks.  Regional Developer acknowledges and agrees that Regional Developer's use of the

Marks and any goodwill established by that use are for our exclusive benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon Regional Developer (other than the right to operate an RD Business under this Agreement). All provisions of this Agreement relating to the Marks apply to any additional and substitute trademarks and service marks we authorize Regional Developer to use.

9.2   Limitations on Regional Developer's Use of Marks.

Regional Developer may not use any Mark: (1) as part of any corporate or legal business name; (2) with any prefix, suffix or other modifying words, terms, designs, symbols other than logos we have licensed to Regional Developer; (3) in selling any unauthorized services or products; (4) as part of any domain name, electronic address or search engine, without our consent; or (5) in any other manner we have not expressly authorized in writing. Regional Developer may not use any Mark in advertising the transfer, sale or other disposition of Regional Developer's business under this Agreement or an ownership interest in Regional Developer (if a corporation, partnership, limited liability company or another business entity holds the franchise at any time during this Agreement's term) without our prior written consent.

9.3   Notification of Infringements and Claims.

Regional Developer agrees to notify us immediately of any apparent infringement of, or challenge to, Regional Developer's use of any Mark, or of any person's claim of any rights in any Mark, and not to communicate with any person other than us and our attorneys and Regional Developer's attorneys regarding any infringement, challenge or claim. We may take action we deem appropriate (including no action) and control exclusively any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising from any infringement, challenge or claim or otherwise concerning any Mark. Regional Developer agrees to sign any documents and take any actions that, in the opinion of our attorneys, are necessary or advisable to protect and maintain our interests in any litigation or Patent and Trademark Office or other proceeding or otherwise to protect and maintain our interests in the Marks.

9.4   Discontinuance of Use of Marks.

If we believe at any time that it is advisable for us and/or Regional Developer to modify or discontinue using any Mark and/or use one or more additional or substitute trademarks or service marks, Regional Developer agrees to comply with our directions within ninety (90) days after receiving notice. We need not reimburse Regional Developer for Regional Developer's expenses in complying with these directions, for any loss of revenue due to any modified or discontinued Mark, or for Regional Developer's expenses of promoting a modified or substitute trademark or service mark.

9.5   Indemnification For Use of Marks.

We agree to indemnify and reimburse Regional Developer against and for all damages for which Regional Developer is held liable in any trademark infringement proceeding arising out of Regional Developer's authorized use of any Mark pursuant to and in compliance with this Agreement, and for all costs Regional Developer reasonably incurs in the defense of any such claim

in which Regional Developer is named as a party, so long as Regional Developer has timely notified us of the claim, and has otherwise complied with this Agreement.  At our option, we may defend and control the defense of any proceeding relating to any Mark.

10.    CONFIDENTIAL INFORMATION.

We possess (and may continue to develop and acquire) certain confidential information relating to the development and operation of Villa Fatima Unit Franchises and RD Businesses (the "Confidential Information"), which includes (without limitation):

(1)    site selection criteria;

(2)    methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, knowledge and experience used in developing and operating Villa Fatima Unit Franchises and Regional Developer Franchises;

(3)    marketing research and promotional, marketing and advertising programs for Villa Fatima Unit Franchises and Regional Developer Franchises;

(4)    knowledge of specifications for and suppliers of, and methods of ordering, certain operating assets and products that Villa Fatima Unit Franchises and Regional Developer Franchises use;

(5)    knowledge of the operating results and financial performance of Villa Fatima Unit Franchises and Regional Developer Franchises;

(6)    customer communication and retention programs, along with data used or generated in connection with those programs; graphic designs and related intellectual property;

(7)    information generated by or used or developed in the operation of Villa Fatima Unit Franchises and Regional Developer Franchises, including customer names, addresses, telephone numbers and related information; and

(8)    any other information designated confidential or proprietary by us.

Regional Developer acknowledges and agrees that by entering into this Agreement, Regional Developer will not acquire any interest in Confidential Information, other than the right to use certain Confidential Information in accordance with this Agreement, and that Regional Developer's use of any Confidential Information in any other business would constitute an unfair method of competition with us and our franchisees.  Regional Developer further acknowledges and agrees that the Confidential Information is proprietary, includes our trade secrets, and is disclosed to Regional Developer only on the condition that Regional Developer agrees, and it does agree, that Regional Developer:

(1)    will not use any Confidential Information in any other business or capacity;

(2)     will keep the Confidential Information absolutely confidential during and after this Agreement's term;

(3)     will not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form;

(4)     will adopt and implement all reasonable procedures that we periodically prescribe to prevent unauthorized use or disclosure of Confidential Information, including, without limitation:  (i) restricting its disclosure to Regional Developer's personnel and Unit Franchisees needing to know such Confidential Information in order to develop and operate the Villa Fatima Unit Franchises; and (ii) requiring those having access to Confidential Information to sign confidentiality and non-disclosure agreements.  We have the right to regulate the form of agreement that Regional Developer uses and to be a third party beneficiary of that agreement with independent enforcement rights; and

(5)     will not sell, trade or otherwise profit in any way from the Confidential Information, except using methods approved by us.

All ideas, concepts, techniques or materials relating to a Villa Fatima Unit Franchise or Regional Developer Franchise, whether or not protectable intellectual property and whether created by or for Regional Developer or its employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property and work made-for-hire for us.  To the extent any item does not qualify as a "work made-for-hire" for us, by this paragraph, Regional Developer assigns ownership of that item, and all related rights to that item, to us and agrees to sign whatever assignment or other documents we request to evidence our ownership or to help us obtain intellectual property rights in the item.

"Confidential Information" does not include information, knowledge or know-how which is or becomes generally known in business consulting industry or which Regional Developer knew from previous business experience before we provided it to Regional Developer (directly or indirectly) or before Regional Developer attended our initial training program.  If we include any material in Confidential Information, anyone who claims that it is not Confidential Information must prove that the exclusion in this paragraph is fulfilled.

11.     <u>ASSIGNABILITY</u>.

11.1     Assignability by Company.

(a)     We shall have the right, but not the obligation, to cause a subsidiary or affiliate of ours to perform any or all of our obligations and exercise any or all of our rights under this Agreement and under any Franchise Agreement, and to require Regional Developer to perform any or all of its obligations hereunder, in favor of such subsidiary or affiliate, by delivery of written notice thereof to Regional Developer.

(b)     We shall have the right to assign this Agreement, or any of our rights and privileges under this Agreement to any other person, firm or corporation, other than a subsidiary or

affiliate of ours, without Regional Developer's prior consent, and we shall not be liable for any obligations accruing under this Agreement after the effective date of such assignment; provided the assignee shall expressly assume and agree to perform our obligations under this Agreement and is reasonably capable of performing them.

11.2    Assignments by Regional Developer.

(a)    We have entered into this Agreement in reliance upon, and in consideration of, the singular personal skills, character, aptitude, business ability, financial capacity and qualifications of Regional Developer and the trust and confidence reposed in Regional Developer or, in the case of a business entity Regional Developer, its owners (individually, an "Owner"). Therefore, neither Regional Developer's interest in this Agreement nor any of its rights or privileges hereunder shall be assigned or transferred, voluntarily or involuntarily, in whole or in part, by operation of law or otherwise, in any manner, without our prior written approval.

(b)    Any assignment or transfer without our approval is a breach of this Agreement and has no effect. In this Agreement, the term "transfer" includes any voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition and includes the following events:

(1)    transfer of record or beneficial ownership of capital stock in Regional Developer (if Regional Developer is a corporation), a partnership or membership interest (if Regional Developer is a partnership or limited liability company), or any other ownership interest or right to receive all or a portion of Regional Developer's profits or losses;

(2)    a merger, consolidation or exchange of shares or other ownership interests, or  issuance of additional ownership interest or securities representing or potentially representing shares or other ownership interests, or a redemption of shares or other ownership interests;

(3)    any sale or exchange of voting interests or securities convertible to voting interests, or any agreement granting the right to exercise or control the exercise of the voting rights of any owner or to control Regional Developer's operations or affairs;

(4)    transfer of an interest in Regional Developer, this Agreement, or RD Business or its assets (or any right to receive all or a portion of RD Business' profits or losses or any capital appreciation relating to the RD Business) in a divorce, insolvency or entity dissolution proceeding, or otherwise by operation of law;

(5)    if Regional Developer or an Owner (if Regional Developer is a business entity) dies, transfer of an interest in Regional Developer, this Agreement, or the RD Business or its assets (or any right to receive all or a portion of Regional Developer Business' profits or losses or any capital appreciation relating to the RD Business) by will, declaration or transfer in trust, or under the law of intestate succession; or

(6)    pledge of this Agreement (to someone other than us) or of an ownership interest in Regional Developer (if Regional Developer is a business entity) as security,

foreclosure upon the Development Area franchises, or Regional Developer's transfer, surrender or loss of the area development franchise possession, control or management.

11.3    Conditions for Approval of Assignment or Transfer.

We may impose any reasonable condition(s) to the granting of our consent to such assignments. Without limiting the generality of the foregoing, the imposition by us of any or all of the following conditions to our consent to any such assignment shall be deemed to be reasonable:

(a)    that the assignee (or the principal officers, shareholders, directors or general partners of the assignee in the case of a business entity assignee) demonstrates that it has the skill, qualifications and economic resources necessary, in our judgment, reasonably exercised, to own and operate the RD Business;

(b)    that Regional Developer has paid all amounts owed to us;

(c)    that the assignee shall expressly assume in writing for our benefit all of the obligations of Regional Developer under this Agreement and any other agreements proposed to be assigned to such assignee;

(d)    that neither the assignee nor its owners or affiliates operate, have an ownership interest in, or performs services for, a Competitive Business (defined in Section 12.2);

(e)    that the assignee shall have completed (or agreed to complete) our training program;

(f)    that the assignee signs our then current form of Regional Developer Agreement, the provisions of which may differ materially from any and all of those contained in this Agreement, and the term of which shall be the remaining term of this Agreement;

(g)    that as of the date of any such assignment, the assignor shall have strictly complied with all of its obligations to us, whether under this Agreement or any other agreement, arrangement or understanding with us;

(h)    that the assignee is not then in default of any obligation to us under any agreement between such assignee and us;

(i)    that the assignor shall pay to us a transfer fee of Thirty Thousand Dollars ($30,000), except for transfers pursuant to Section 11.4 below;

(j)    that the assignor and the assignor's spouse (if any) shall sign a general release, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective shareholders, officers, directors, employees, representatives, agents, successors and assigns; and

(k)    that assignor will not directly or indirectly at any time or in any manner identify himself, herself or itself or any of assignor's business as a current or former Villa Fatima

Unit Franchise or as one of our Unit Franchisees or Regional Developers, use any Mark, any colorable imitation of a Mark, or other indicia of a Villa Fatima Unit Franchise or Regional Developer Franchise in any manner or for any purpose, or utilize for any purpose any trade name, trademark, service mark or other commercial symbol that suggests or indicates a connection or association with us.

Regional Developer shall not in any event have the right to pledge, encumber, charge, hypothecate or otherwise give any third party a security interest in this Agreement in any manner whatsoever without our express prior written permission, which permission may be withheld for any reason whatsoever in our sole subjective judgment.

11.4    Assignment to Entity Principally Controlled By You.

The Regional Developer Franchise and its assets and liabilities may be assigned to a newly formed corporation or other legal entity that conducts no business other than the operation of the franchise and in which you and any of your principals own and control in the aggregate not less than ninety percent (90%) of the equity and voting power of all outstanding capital stock or ownership interest, provided as follows:

(a)    that the proposed transferee complies with the provisions of this Agreement; and

(b)    that you are empowered to act for said corporation or other legal entity; and

(c)    that you shall submit to us documentation that we may reasonably request to effectuate the transfer; and

(d)    that you shall submit to us a true and complete list of the shareholders, members or partners, showing number of shares or interests owned, and a list of the officers and directors if a corporation, or managers if a limited liability company, or managing partners if a partnership. We shall be promptly notified of any changes in said lists; and

(e)    that all certificates of shares or interests issued by transferee at any time shall have endorsed with the appropriate legend to conform with state law, referring to this Agreement by date and name of parties hereto and stating "Transfer to This Certificate is Limited by the Terms and Conditions of a Regional Developer Agreement dated _____;" and

(f)    that a copy of this Agreement shall be given to every shareholder, member or partner; and

(g)    that a copy of the organizational documents and any corporate resolutions and a Certificate of Good Standing will be furnished to us at our reasonable request, and prompt notification in writing of any amendments thereto will be provided to us; and

(h)    that the number of shares or interests issued or outstanding in the transferee will not be increased or decreased without prior written notice to us, which notice will in its terms guarantee compliance with this Agreement. In addition, new shareholders, members or partners

must be approved by us and agree to be bound by this entire Agreement.  Shareholders, members or partners may make a separate agreement among them providing for purchase by the survivors among them of the shares of any shareholders or interests of any members or partners upon death, or other agreements affecting ownership or voting rights, so long as voting control and a majority representation of the board of directors or members or partners remains with those individuals who initially applied for and were approved as franchisees under this Agreement.  Shareholders, members or partners must notify us in writing of any such agreement which affects control of the transferee.

11.5    Death or Disability.

(a)    Upon the death or disability of Regional Developer or an Owner, the executor, administrator, conservator, guardian or other personal representative must assign, sell, or transfer Regional Developer's interest in this Agreement, the RD Business and its assets, or the Owner's ownership interest in Regional Developer, to a third party approved by us.  That transfer (including, without limitation, transfer by bequest or inheritance) must occur, subject to our rights, within a reasonable time, not to exceed nine (9) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 11.  A failure to transfer such interest within this time period is a breach of this Agreement.  The term "disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent Regional Developer from supervising the Development Area management and operation for ninety (90) or more consecutive days.

(b)    If, upon the death or disability of Regional Developer or an Owner, a trained manager who we approve is not managing the day-to-day operations of the Franchise, then the executor, administrator, conservator, guardian or other personal representative must, within a reasonable time not to exceed thirty (30) days from the date of death or disability, appoint a manager that we must approve to operate the RD Business.  The manager must, at Regional Developer's or the Owner's estate's expense, satisfactorily complete the training we designate within the specified time period.

11.6    Company's Right of First Refusal.

If Regional Developer at any time determines to sell or transfer an interest in this Agreement or the RD Business, or if Owner determines to sell or transfer a controlling ownership interest in Regional Developer, then Regional Developer or the Owner, as applicable (the "Seller") must obtain from a responsible and fully disclosed buyer, and send us a true and complete copy of a bona fide, executed written offer relating exclusively to an interest in Regional Developer or this Agreement and the RD Business.  The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price.  To be a valid, bona fide offer, the proposed purchase price must be in a fixed dollar amount and without any contingent payments of purchase price (such as earn-out payments).

We may, by delivering written notice to the Seller within thirty (30) days after we receive both an exact copy of the offer and all other information requested, elect to purchase the interest for the price and on the terms and conditions contained in the offer, provided that: 1) we may substitute cash for any form of payment proposed in the offer; (2) our credit will be deemed equal to the credit of any proposed buyer; (3) the closing will occur within sixty (60) days after notifying the Seller of

our election to purchase or, if later, the closing date proposed in the offer; and (4) we must receive, and the Seller agrees to make, all customary representations and warranties given by the seller of the assets of a business or ownership interests in a legal entity, as applicable, including, without limitation, representations and warranties regarding ownership and condition of, and title to, assets and (if applicable) ownership interests and validity of contracts and the liabilities, contingent or otherwise, relating to the assets or ownership interests being purchased. If we exercise our right of first refusal, the Seller agrees that, for one (1) year beginning on the closing date, the Seller and members of its immediate family will be bound by the non-competition covenant contained in Section 12.2 below.

If we do not exercise our right of first refusal, the Seller may complete the sale to the proposed buyer on the original offer's terms, subject to our approval of the transfer as provided above.  If the Seller does not complete the sale to the proposed buyer within sixty (60) days after we notify the Seller that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which the Seller must let us know promptly), we will have an additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our option.

    11.7    Ownership Structure.

Regional Developer represents and warrants that all persons holding direct or indirect, legal or beneficial ownership interest in Regional Developer (collectively, the "Owners'") are listed in Exhibit 3 and that its ownership structure is as set forth on Exhibit 3.  In consideration of, and as an inducement to, the execution of this Agreement, each Owner of the Regional Developer and their respective spouses shall personally and unconditionally sign our Guaranty and Assumption of Obligations form, attached as Exhibit 4, guarantying to us and our successors and assigns that the Regional Developer will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and agreeing to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.  Regional Developer shall not change its ownership structure without complying with all of the terms and conditions of this Section 11. Within ten (10) days of any change in Regional Developer's ownership structure, Regional Developer shall submit a revised Exhibit 3 to us and any new Owner shall sign our Guaranty and Assumption of Obligations form.

12.    NON-COMPETITION.

    12.1    In Term.

During the term of this Agreement, neither Regional Developer, nor any of the Principals, nor any member of Regional Developer's or a Principal's immediate family will have any direct or indirect interest (e.g., through a spouse) as a disclosed or beneficial owner, investor, partner, director, officer, controlling shareholder, employee, consultant, representative or agent, or in any other capacity, in a Competitive Business (defined below), whether located within or outside the Development Area, unless we shall first consent thereto in writing.

12.2   Post-Term.

(a)   Non-Certificate of Need States.

The following applies in all states that do not require the issuance of a certificate of need. In such states, for a twelve (12) month period following the assignment, expiration or termination of this Agreement, for any reason, neither Regional Developer, nor any Owner, nor any member of Regional Developer's or an Owner's immediate family will have any direct or indirect interest (e.g., through a spouse) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any Competitive Business located or operating: (x) within the Development Area; (y) within the development area of any of our other Regional Developers; or (z) within ten (10) miles of any Villa Fatima Unit Franchise or Regional Developer Franchise in operation or development on the date of assignment, expiration or termination.

(b)   Certificate of Need States.

The following applies in all states that do require the issuance of a certificate of need. In such states, for the greater of (i) a twelve (12) month period following the assignment, expiration or termination of this Agreement for any reason, or (ii) ninety (90) days after Franchisor or another Villa Fatima Unit franchisee obtains a certificate of need corresponding to the Franchise Premises, neither Regional Developer, nor any Owner, nor any member of Regional Developer's or an Owner's immediate family will have any direct or indirect interest (e.g., through a spouse) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any Competitive Business located or operating: (x) within the Development Area; (y) within the development area of any of our other Regional Developers; or (z) within ten (10) miles of any Villa Fatima Unit Franchise or Regional Developer Franchise in operation or development on the date of assignment, expiration or termination.

(c)   The term "Competitive Business" above means any business that derives more than Ten Thousand Dollars ($10,000.00) of revenue per year from the sale or services providing secure dementia care and transitional care, or other related products and services, or any business that grants franchises or licenses to others to operate such a business, other than a Villa Fatima Unit Franchise operated under a franchise agreement with us.

13.   TERMINATION.

13.1   Termination by Company.

We may terminate this Agreement, effective upon written notice of termination to Regional Developer, if:

(a)   Regional Developer or one of its Owners makes or attempts to make a transfer in violation of Section 11;

(b)   Regional Developer fails to meet the RD Minimum Development Obligation for any Development Period;

(c)     Regional Developer has made, or makes, a material misrepresentation or omission in acquiring the rights under this Agreement or in operating the RD Business;

(d)     Regional Developer does not satisfactorily complete initial training;

(e)     Regional Developer is convicted by a trial court of, or pleads no contest to, a felony;

(f)     Regional Developer fails to maintain the insurance we require from time to time;

(g)     Regional Developer or an Owner engages in any dishonest, unethical or illegal conduct or any other conduct which, in our opinion, adversely affects our reputation, the reputation of other Villa Fatima Unit Franchises or the goodwill associated with the Marks;

(h)     Regional Developer knowingly makes any unauthorized use or disclosure of any part of the Manuals or any other Confidential Information;

(i)     Regional Developer (a) fails on three (3) or more separate occasions within any twenty-four (24) consecutive month period to submit when due reports or other data, information or supporting records, pay when due any amounts due to us (or our affiliates), or otherwise comply with this Agreement, whether or not Regional Developer corrects any of these failures after we deliver written notice to Regional Developer; or (b) fails on two (2) or more separate occasions within any twelve (12) consecutive month period to comply with the same obligations under this Agreement, whether or not Regional Developer corrects either of the failures after we deliver written notice to Regional Developer;

(j)     Regional Developer makes an assignment for the benefit of creditors or admits in writing insolvency or inability to pay debts generally as they become due; Regional Developer consents to the appointment of a receiver, trustee or liquidator of all or the substantial part of the assets of the RD Business; or the assets of the RD Business are attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant or levy is vacated within thirty (30) days following the order's entry;

(k)     Regional Developer fails to comply with any other provision of this Agreement and does not correct the failure within thirty (30) days after we deliver written notice of the failure to Regional Developer;

(l)     Regional Developer fails to pay any sums due to us and does not correct the failure within ten (10) days after we deliver written notice of that failure to Regional Developer; or

(m)     Regional Developer fails to comply with (a) the most current version of the ERD or its equivalent or (b) the Magisterial Teachings of the Catholic Church where applicable.

We have the right to terminate any other agreement between us and Regional Developer due to a default by Regional Developer.

13.2    Rights and Obligations Upon Termination or Expiration.

Upon the expiration of the Term, or upon the earlier termination of this Agreement, Regional Developer shall have no further right to construct, equip, own, open or operate additional Villa Fatima Unit Franchises (except pursuant to a separate Franchise Agreement between Regional Developer and us which is in full force and effect on the date of expiration or termination). Upon expiration or termination of this Agreement, we may ourselves construct, equip, open, own or operate, or license others to construct, equip, open, own or operate Villa Fatima Unit Franchises in the Development Area, except as provided in any separate Franchise Agreement executed pursuant to this Agreement. When this Agreement expires or is terminated for any reason and except as required to perform Regional Developer's obligations under a valid separate Franchise Agreement with us, Regional Developer shall:

(a)    not directly or indirectly at any time thereafter or in any manner: (a) identify itself or any business as a current or former Regional Developer of ours; (b) use any Mark, any colorable imitation of a Mark, any trademark, service mark or commercial symbol that is confusingly similar to any Mark or other indicia of a Villa Fatima Unit Franchise in any manner or for any purpose; or (c) use for any purpose any trade name, trademark, service mark or other commercial symbol that indicates or suggests a connection or association with us;

(b)    take the actions required to cancel all fictitious or assumed name or equivalent registrations relating to Regional Developer's use of any Mark;

(c)    deliver to us within thirty (30) days all advertising, marketing and promotional material, forms and other materials containing any Mark or otherwise identifying or relating to the RD Business or to a Villa Fatima Unit Franchise;

(d)    if applicable, notify all search engines of the termination or expiration of Regional Developer's right to use all domain names, Websites and other search engines associated directly or indirectly with the Marks or Villa Fatima Unit Franchises and authorize those search engines to transfer to us, or our designee, all rights to the domain names, Websites and search engines relating to the Marks or Villa Fatima Unit Franchises. We have the absolute right and interest in, and to, all domain names, Websites and search engines associated with the Marks or Villa Fatima Unit Franchises, and Regional Developer hereby authorizes us to direct all applicable parties to transfer Regional Developer's domain names, Websites and search engines to us or our designee if this Agreement expires or is terminated for any reason whatsoever. All parties may accept this Agreement as conclusive of our right to such domain names, Websites and search engines and this Agreement will constitute the authority from Regional Developer to all parties to transfer all such domain names, Websites and search engines to us;

(e)    immediately cease using any of our Confidential Information in any business or otherwise and return to us all copies of the Manuals and any other confidential materials that we have lent to Regional Developer; and

(f)    give us, within thirty (30) days after the expiration or termination of this Agreement, evidence satisfactory to us of Regional Developer's compliance with these obligations.

14.   SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF; MEDIATION.

Provided we give you the appropriate notice, we will be entitled, without being required to post a bond, to the entry of temporary and permanent injunctions and orders of specific performance to (1) enforce the provisions of this Agreement relating to your use of the Marks and non-disclosure and non-competition obligations under this Agreement; (2) prohibit any act or omission by you or your employees that constitutes a violation of any applicable law, ordinance, or regulation; constitutes a danger to the public; or may impair the goodwill associated with the Marks or Villa Fatima Franchises; or (3) prevent any other irreparable harm to our interests. If we obtain an injunction or order of specific performance, then you shall pay us an amount equal to the total of our costs of obtaining it, including without limitation, reasonable attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, and any damages we incur as a result of the breach of any such provision. You further agree to waive any claims for damage in the event there is a later determination that an injunction or specific performance order was issued improperly.

Except insofar as we elect to enforce this Agreement or to seek temporary or permanent injunctive relief as provided above, the parties will attempt, in good faith, to resolve promptly, through negotiation, all controversies, disputes or claims arising between us, our affiliates, and our and their respective owners, officers, directors, agents, and employees (in their representative capacity) and you (and your Principal Owners and guarantors) arising out of or related to: (1) this Agreement, any provision thereof, or any related agreement (except for any lease or sublease with us or any of our affiliates); (2) the relationship of the parties hereto; (3) the validity of this Agreement or any related agreement, or any provision thereof; or (4) any specification, standard or operating procedure relating to the establishment or operation of the Franchise. For such purpose, any party may request the others to meet within fifteen (15) days at a mutually agreed upon time and place. If the parties are not able to conduct a meeting within said fifteen (15) day period or to resolve the dispute within thirty (30) days after their first negotiating meeting (or such longer period of time as may be mutually agreed upon), any party may then refer the claim or controversy to non-binding mediation conducted by a reputable and licensed mediator in the Tucson, Arizona area (the "Mediator") by sending a written mediation request to the other parties (the "Mediation Request") In the event that a Mediation Request is made, the parties agree to participate in the mediation process. The parties and the Mediator may join in the mediation any other party necessary for a mutually acceptable resolution of the dispute. Should the Mediator at any time be unable or unwilling to serve, the parties shall select a successor Mediator. The mediation procedure shall be determined by the Mediator in consultation with the parties. The fees and expenses of the Mediator shall be borne equally by the parties. Should such mediation efforts fail to resolve the dispute, then the parties are free to seek enforcement of the agreement through any legal means.

15.   GENERAL CONDITIONS AND PROVISIONS.

15.1   Relationship of Regional Developer to Company.

It is expressly agreed that the parties intend by this Agreement to establish between us and Regional Developer the relationship of franchisor and franchisee. Except as expressly provided herein, it is further agreed that Regional Developer has no authority to create or assume in our name

or on our behalf, any obligation, express or implied, or to act or purport to act as agent or representative on our behalf for any purpose whatsoever. In no event shall either party be deemed to be fiduciaries of the other. Neither we nor Regional Developer is the employer, employee, agent, partner or co-venturer of, or with the other, each being independent contractors. Regional Developer agrees that it will not hold itself out as the agent, employee, partner or co-venturer of ours, or as having any of the aforesaid authority. All Employees hired by, or working for, Regional Developer shall be the employees of Regional Developer and shall not, for any purpose, be deemed employees of us or subject to our control.

15.2    Indemnification.

To the fullest extent permitted by law, Regional Developer agrees to indemnify, defend and hold harmless us, our affiliates, and our and their respective shareholders, directors, officers, employees, agents, representatives, successors and assigns (the "Indemnified Parties") from and against all claims, obligations and damages (and to reimburse any one or more of the Indemnified Parties for any damages incurred as a result of such claims and obligations) directly or indirectly arising out of: (1) the RD Business conducted by Regional Developer pursuant to this Agreement, (2) Regional Developer's breach of this Agreement, or (3) Regional Developer's non-compliance or alleged non-compliance with any law, ordinance, rule or regulation. For purposes of this indemnification, "claims" include all obligations, damages (actual, consequential, punitive or otherwise) and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness' fees, costs of investigation and proof of facts, court costs, travel and living expenses and other expenses of litigation, arbitration or alternative dispute resolution, regardless of whether litigation or alternative dispute resolution is commenced. Each Indemnified Party may defend and control the defense of any claim against it which is subject to this indemnification at Regional Developer's expense, and Regional Developer may not settle any claim or take any other remedial, corrective or other actions relating to any claim without our consent. This indemnity will continue in full force and effect, subsequent to and notwithstanding, this Agreement's expiration or termination. An Indemnified Party need not seek recovery from an insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against Regional Developer. Regional Developer agrees that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from Regional Developer.

15.3    Waiver and Delay.

Except as otherwise expressly provided to the contrary, no waiver by us of any breach or series of breaches or defaults in performance by the Regional Developer, and no failure, refusal or neglect of, or by, us to exercise any right, power or option given to us under this Agreement or under any other agreement  between us and Regional Developer, whether entered into before, after or contemporaneously with the execution of this Agreement (and whether or not related to this Agreement) or to insist upon strict compliance with or performance of the Regional Developer's obligations under this Agreement or any other agreement between us and Regional Developer, whether entered into before, after or contemporaneously with the execution of this Agreement (and whether or not related to this Agreement), shall constitute a novation, or a waiver of the provisions of this Agreement with respect to any subsequent breach thereof or a waiver of our right at any time thereafter to require exact and strict compliance with the provisions thereof.

15.4    Survival of Covenants.

The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement or ancillary agreements shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

15.5    Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of our and Regional Developer's legal representatives, successors and assigns.

15.6    Joint and Several Liability.

If either party consists of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to the other under this Agreement are joint and several.

15.7    Governing Law.

Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.), this Agreement and the Regional Developer Franchise will be governed by the internal laws of the State of Arizona (without reference to its choice of law and conflict of law rules), except that the provisions of any Arizona law relating to the offer and sale of business opportunities or franchises or governing the relationship of a franchisor and its franchisees will not apply unless their jurisdictional requirements are met independently without reference to this paragraph.  You agree that we may institute any action against you arising out of or relating to this Agreement (which is not required to be arbitrated hereunder or as to which arbitration is waived) in any state or federal court of general jurisdiction in Pima County, Arizona, and you irrevocably submit to the jurisdiction of such courts and waive any objection you may have to either the jurisdiction or venue of such court.

15.8    Consent to Jurisdiction.

Subject to Section 14 and the provisions below, Regional Developer and its owners agree that all actions arising under this Agreement or otherwise as a result of the relationship between Regional Developer and us must be commenced in the State of Arizona, and in the state or federal court of general jurisdiction closest to where our principal business address then is located, and Regional Developer (and its Owners) irrevocably submits to the jurisdiction of those courts and waives any objection Regional Developer (or its Owners) might have with either the jurisdiction of, or venue in, those courts. Nonetheless, Regional Developer and any of its Owners agree that we may enforce this Agreement and any arbitration orders and awards in the courts of the state or states in which Regional Developer or its Owners are domiciled.

15.9    Waiver of Punitive Damages and Jury Trial.

Except for Regional Developer's obligation to indemnify us under Section 15.2 above and except where authorized by federal statute, we and Regional Developer and its Owners waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between us and Regional Developer, the party making a claim will be limited to equitable relief and to recovery of any actual damages it sustains. We and Regional Developer irrevocably waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity, brought by either party.

15.10    Limitation of Claims.

Any and all claims arising out of, or relating to, this Agreement or our relationship with Regional Developer, except for claims for indemnification under Section 15.2 above, will be barred unless a judicial or arbitration proceeding is commenced within two (2) years from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

15.11    Entire Agreement.

This Agreement and all exhibits to this Agreement constitute the entire agreement between the parties and supersede any and all prior negotiations, understandings, representations, and agreements.  Nothing in this or in any related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.  You acknowledge that you are entering into this Agreement as a result of your own independent investigation of our franchised business and not as a result of any representations about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to the terms set forth in this Agreement, or in any disclosure document, prospectus, or other similar document required or permitted to be given to you pursuant to applicable law.  Any provisions of state law applicable to the state where you will operate your franchise are contained in Exhibit 5.  This Agreement cannot be modified or changed except by written instrument signed by all of the parties to this Agreement, provided that we may modify or amend the Manuals at any time without notice to, or approval of, Regional Developer or any other person.

15.12    Titles for Convenience.

Article and Section titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions of this Agreement.

15.13    Gender.

All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context or sense of this Agreement or any section or paragraph hereof may require.

15.14   Severability.

Except as expressly provided to the contrary in this Agreement, each Section, paragraph, term and provision of this Agreement in severable, and if, for any reason, any part thereof, is found to be invalid or contrary to, or in conflict with, any applicable present or future law and regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction, that ruling will not impair the operation, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties.   If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, we and Regional Developer agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.   If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of this Agreement's termination or of our refusal to enter into a successor agreement, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement is invalid or unenforceable or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provisions to the extent required to be valid and enforceable or delete the unlawful provision in its entirety.   Regional Developer agrees to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

15.15   Fees and Expenses.

Should any party to this Agreement commence any action or proceeding for the purpose of enforcing, or preventing the breach of, any provision of this Agreement, whether by arbitration, judicial or quasi-judicial action or otherwise, or for damages for any alleged breach of any provision of this Agreement, or for a declaration of such party's rights or obligations under this Agreement, then the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in connection therewith, including, but not limited to, reasonable attorneys' fees for the services rendered to such prevailing party.

15.16   Notices.

Except as otherwise expressly provided herein, all written notices and reports permitted or required to be delivered by the parties pursuant to this Agreement shall be deemed so delivered at the time delivered by hand, one (1) business day after transmission by mail, via registered or certified mail, return receipt requested; or one (1) business day after placement with Federal Express, or other reputable air courier service, requesting delivery on the most expedited basis available, postage prepaid and addressed as follows:

| | |
|---|---|
| If to company: | FATIMA LIFE PLAN, INC. |
| | 8810 E. Tanque Verde Road |
| | Tucson, Arizona 85749 |
| | Attn: Kelly Copeland |
| | Facsimile: (520) 844-1060 |

With a copy to:                 _____
                                _____
                                _____
                                _____

If to Regional Developer:       Jeffrey A Ketelhut and Marcella T Ketelhut
                                36 Pinecrest Drive
                                Thousand Oaks CA 91361

With a copy to:                 _____
                                _____
                                _____
                                _____

Or to such other addresses any such party may designate by ten (10) days' advance written notice to the other party.

15.17   Time of Essence.

Time shall be of the essence for all purposes of this Agreement.

15.18   Lien and Security Interest.

To secure your performance under this Agreement and indebtedness for all sums due us or our affiliates, we shall have a lien upon, and you hereby grant us a security interest in, the following collateral and any and all additions, accessions, and substitutions to or for it and the proceeds from all of the same: (a) all inventory now owned or after-acquired by you and the RD Business, including but not limited to all inventory and supplies transferred to or acquired by you in connection with this Agreement; (b) all accounts of you and/or the RD Business now existing or subsequently arising, together with all interest in you and/or the RD Business, now existing or subsequently arising, together with all chattel paper, documents, and instruments relating to such accounts; (c) all contract rights of you and/or the RD Business, now existing or subsequently arising; and (d) all general intangibles of you and/or the RD Business, now owned or existing, or after-acquired or subsequently arising.  You agree to execute such financing statements, instruments, and other documents, in a form satisfactory to us, that we deem necessary so that we may establish and maintain a valid security interest in and to these assets.

16.   SUBMISSION OF AGREEMENT.

This Agreement shall not be binding upon us unless and until it shall have been submitted to and signed by our Manager, and the date of said signing as set forth on the first page of this Agreement shall be the effective date of this Agreement.

17.   ACKNOWLEDGMENTS.

To induce us to sign this Agreement and grant Regional Developer the Franchise, Regional Developer acknowledges:

(a)    That Regional Developer has independently investigated the Villa Fatima RD Business franchise opportunity and recognizes that, like any other business, the nature of the RD Business may, and probably will, evolve and change over time.

(b)    That an investment in a Villa Fatima Regional Developer Business involves business risks.

(c)    That Regional Developer's business abilities and efforts are vital to Regional Developer's success.

(d)    That performing Regional Developer's obligations will require a high level of customer service and strict adherence to the System.

(e)    That Regional Developer has not received or relied upon, and we expressly disclaim making any representation, warranty or guaranty, express or implied, as to the revenues, profits or success of a Villa Fatima Regional Developer Franchise or any Villa Fatima Unit Franchise.

(f)    That any information Regional Developer has acquired from other Unit Franchisees or Regional Developers regarding their sales, profits or cash flows is not information obtained from us, and we make no representation about that information's accuracy.

(g)    That Regional Developer has no knowledge of any representations made about the Villa Fatima Regional Developer franchise opportunity by us, our subsidiaries or affiliates or any of their respective officers, directors, shareholders or agents that are contrary to the statements made in our Franchise Disclosure Document or to the terms and conditions of this Agreement.

(h)    That in all of their dealing with Regional Developer, our officers, directors, employees and agents act only in a representative, and not in an individual capacity and that business dealings between Regional Developer and them as a result of this Agreement are only between Regional Developer and us.

(i)    That Regional Developer has represented to us, to induce us to enter into this Agreement, that all statements Regional Developer has made and all materials Regional Developer has given to us in acquiring the franchise are accurate and complete and that Regional Developer has made no misrepresentations or material omissions in obtaining the franchise.

(j)    That Regional Developer has read this Agreement and our Franchise Disclosure Document and understands and accepts that the terms and covenants in this Agreement are reasonably necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Villa Fatima Regional Developer Business and Villa Fatima Unit Franchise, and to protect and preserve the goodwill of the Marks.

**IN WITNESS WHEREOF,** the parties to this Agreement have caused this Agreement to be executed as of the first date set forth above.

COMPANY:

**FATIMA LIFE PLAN, INC.,**
**an Arizona corporation,**

_____

By: Kelly Copeland, its President

**REGIONAL DEVELOPER:**

Jeffrey A Ketelhut
Marcella T Ketelhut
36 Pinecrest Drive
Thousand Oaks CA 91361

By: _____
        Jeffrey A Ketelhut

By: _____
        Marcella T Ketelhut

Its:_____

## A.  EXHIBIT 1

## TO THE FATIMA LIFE PLAN, INC. REGIONAL DEVELOPER AGREEMENT

## DEVELOPMENT AREA

The Development Area referred to in Recitals D and E of this Agreement shall be the following: DENVER area & suberbs as defined by:

NORTH
Fort Collins

WEST                                              EAST
Boulder                                     Denver Int'l Airport

SOUTH
Castle Rock

**B.  EXHIBIT 2**

**TO THE FATIMA LIFE PLAN, INC. REGIONAL DEVELOPER AGREEMENT**

**DEVELOPMENT OBLIGATION**

The Minimum Development Obligation referred to in Paragraph 3.1(a) of this Agreement shall be the following:

Regional Developer shall construct, equip, open and operate, and solicit, screen, qualify, train and assist Prospective Franchisees to construct, equip, open and operate, within the Development Area, not fewer than ____ Villa Fatima Unit Franchises within the first year of this Agreement, not fewer than ____ Villa Fatima Unit Franchises within the second year of this Agreement, and not fewer than ____ Villa Fatima Unit Franchises in each subsequent year of this Agreement.  In addition, Regional Developer shall be required to:

_____

_____

_____

_____

_____

_____

_____

_____

## C. EXHIBIT 3

### TO THE FATIMA LIFE PLAN, INC. REGIONAL DEVELOPER AGREEMENT

### OWNERSHIP INTERESTS IN REGIONAL DEVELOPER

3-1.   Full name and address of the owners of, and a description of the type of, all currently held Interests in Regional Developer: _____

_Ketelhut & Associates, LLC_

_36 Pinecrest Drive_

_Thousand Oaks, CA 91361_

_Members:   Jeffrey A. Ketelhut_

_Marcella T. Ketelhut_

_Sarah E. Ketelhut_

3-2.   Minimum individual and aggregate Principal Owner ownership percentage required at all times during the term of this Agreement:

3-2.1   During the term of this Agreement, the Principal Owners together must have a "controlling interest" (i.e., a ninety percent (90%) "ownership interest" of the equity, voting control and profits) in Regional Developer.

3-2.2   Unless otherwise permitted, the required minimum "ownership interest" of each Principal Owner during the term of this Agreement is:

| **Name** | **Ownership Percentage** |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

## D.  EXHIBIT 4

## TO THE FATIMA LIFE PLAN, INC. REGIONAL DEVELOPER AGREEMENT

## OWNER'S GUARANTY AND ASSUMPTION OF OBLIGATIONS

In consideration of, and as an inducement to, the execution of the Regional Developer Agreement, dated as of this March 19th, 2014 Feast day of St. Joseph ("the Agreement"), by and between Fatima Life Plan, Inc. ("we" or "us"), an Arizona corporation, and Jeffrey A Ketelhut and Marcella T Ketelhut, whose address is 36 Pinecrest Drive Thousand Oaks, California 91361 ("the Regional Developer"), each of the undersigned owners of the Regional Developer and their respective spouses ("you," for purposes of this Guaranty only), hereby personally and unconditionally agree to perform and keep during the terms of the Agreement, each and every covenant, obligation, payment, agreement, and undertaking on the part of Regional Developer contained and set forth in the Agreement.  Each of you agree that all provisions of the Agreement relating to the obligations of Regional Developers, including, without limitation, the covenants of confidentiality and non-competition and other covenants set forth in the Agreement, shall be binding on you.

Each of you waives (1) protest and notice of default, demand for payment or nonperformance of any obligations guaranteed by this Guaranty; (2) any right you may have to require that an action be brought against Regional Developer or any other person as a condition of your liability; (3) all right to payment or reimbursement from, or subrogation against, the Regional Developer which you may have arising out of your guaranty of the Regional Developer's obligations; and (4) any and all other notices and legal or equitable defenses to which you may be entitled in your capacity as guarantor.

Each of you consents and agrees that (1) your direct and immediate liability under this Guaranty shall be joint and several; (2) you will make any payment or render any performance required under the Agreement on demand if Regional Developer fails or refuses to do so when required; (3) your liability will not be contingent or conditioned on our pursuit of any remedies against Regional Developer or any other person; (4) your liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which we may from time to time grant to Regional Developer or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims; and (5) this Guaranty will continue and be irrevocable during the term of the Agreement and afterward for so long as the Regional Developer has any obligations under the Agreement.

If we are required to enforce this Guaranty in a judicial or arbitration proceeding, and prevail in such proceeding, we will be entitled to reimbursement of our costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any

such proceeding.  If we are required to engage legal counsel in connection with any failure by you to comply with this Guaranty, you agree to reimburse us for any of the above-listed costs and expenses incurred by us.

*[Remainder of Page Left Intentionally Blank – Signature Page Follows]*

## E.  EXHIBIT 5

## TO THE FATIMA LIFE PLAN, INC. REGIONAL DEVELOPER AGREEMENT

### STATE-SPECIFIC ADDENDA

---

**STATE OF CALIFORNIA'S SPECIFIC DISCLOSURE ADDENDUM**

---

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

Section 31125 of the California Franchise Investment Law requires us to give to you a disclosure document approved by the Commissioner of Corporations before we ask you to consider a material modification of your Agreement.

Our website address is provided to you on the Cover Page of the Franchise Disclosure Document.  OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS.  ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF CORPORATIONS at www.corp.ca.gov.

**Item 3 (The disclosures required to be made in Item 3 of this Disclosure Document are supplemented as follows):**

Franchisor, persons or franchise brokers disclosed in Item 2 who are subject to any currently effective order of any national securities association or national securities exchange as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78 a *et seq.*, suspending or expelling such persons from membership in such association or exchange: None – (end of item 3 supplement).

**Item 17 (The disclosures required to be made in Item 17 of this Disclosure Document are supplemented as follows):**

California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee concerning termination or non-renewal of a franchise.  If the Agreement contains a provision that is inconsistent with the law, the law will control.

The Agreement provides for termination upon bankruptcy.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 *et seq.*).

The Agreement contains a covenant not to compete which extends beyond the termination of the franchise.  This provision may not be enforceable under California law.

The Agreement contains a liquidated damage clause.  Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of an agreement restricting venue to a forum outside the State of California.

The Agreement requires application of the laws of another state than the State of California.  This provision may not be enforceable under California law.

You must sign a general release of claims if you transfer your franchise.  California Corporations Code Section

This Guaranty is now executed as of the Agreement Date.

**OWNER:**                                      **OWNER'S SPOUSE:**

_____                         _____
Name: _____                        Name: _____

**OWNER:**                                      **OWNER'S SPOUSE:**

_____                         _____
Name: _____                        Name: _____

**OWNER:**                                      **OWNER'S SPOUSE:**

_____                         _____
Name: _____                        Name: _____

NOTARY PUBLIC

State of                    )
                            ) ss.
County of                   )

       I,_____, a notary in the State of _____, County of _____, do hereby certify that the foregoing Guaranty and Assumption of Obligations was acknowledged before me this _____ day of _____, _____, by _____ and _____, who is (are) personally known to me or who has (have) produced identification demonstrating his/her identity.

_____
Signature of Person Taking Acknowledgement

My Commission Expires: _____

31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Section 31000 through 31516).  Business and Professions Code Section 30010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 through 20043) – (end of item 17 supplement).

Executed as of the Agreement Date

Fatima Life Plan, Inc.

_____

By: Kelly Copeland, its President

Regional Developer

By:_____

Its:_____

## STATE OF CONNECTICUT'S SPECIFIC DISCLOSURE ADDENDUM

The delivery date of the services to be provided by us is within ninety (90) days of signing the Agreement by you.

Executed as of the Agreement Date

Fatima Life Plan, Inc.

_____

By: Kelly Copeland, its President

Regional Developer

By:_____

Its:_____



**FATIMA LIFE PLAN, INC**

**FIRST ADDENDUM REGIONAL DEVELOPER AGREEMENT**



## FATIMA LIFE PLAN, INC.

### FIRST ADDENDUM REGIONAL DEVELOPER AGREEMENT

THIS FIRST ADDENDUM TO REGIONAL DEVELOPER AGREEMENT (the "Agreement")  is made and entered into this March 19th, 2014 Feast day of St. Joseph (the "Effective Date"), by and between Fatima Life Plan, Inc., an Arizona corporation ("Company", "we", "us" or "our" or "Villa Fatima"), and Jeffrey A Ketelhut and Marcella T Ketelhut, whose address is 36 Pinecrest Drive Thousand Oaks, California 91361 corporation/limited liability company/partnership (Circle One) (referred to as "Regional Developer", "you" or "your"), with reference to the following facts, supersedes any terms amended in that Agreement as referenced below and adds those additional terms as agreed upon by FATIMA LIFE PLAN, INC., and Regional Developer. Except for the changes herein below set forth, the remaining provisions of said Regional Developer Agreement shall be, and the same are hereby ratified and confirmed.

1.       THAT SECTION 2 "DEVELOPMENT FEE" OF SAID REGIONAL AGREEMENT SHALL REMAIN AS AGREED EXCLUDING THOSE PORTIONS STRUCK THROUGH AND ADDITIONAL LANGUAGE ADDED AS AGREED. ADDITIONAL AGREED UPON LANGUAGE IS UNDERLINED:

2.       DEVELOPMENT FEE.

    2.1 Payment of Development Fee

Regional Developer shall pay a "Development Fee" of one hundred fifty thousand dollars ($150,000). ~~pay to us a non-refundable~~ The initial deposit of the Development Fee shall be fifty thousand ($50,000) to be paid upon execution of this Agreement as a partial down payment of the total Development Fee. The Regional Developer shall pay one-hundred thousand dollars ($100,000) when the first facility in the Denver region is sold.

~~ranging from One Hundred Thousand and No/100 Dollars ($100,000.00) and Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), payable upon execution of this Agreement.~~

COMPANY:

**FATIMA LIFE PLAN, INC.,**
**an Arizona corporation,**


By: _____
          Kelly Copeland, its President



**REGIONAL DEVELOPER:**


**Jeffrey A Ketelhut**
**Marcella T Ketelhut**
**36 Pinecrest Drive**
**Thousand Oaks CA 91361**


By: _____
          Jeffrey A Ketelhut

By: _____
          Marcella T. Ketelhut

Its: _____



# THIS IS THE END OF THE FIRST ADDENDUM TO THE

# REGIONAL DEVELOPER AGREEMENT.

**EXHIBIT C**

Dated: April 14, 2014

CONVERTIBLE PROMISSORY NOTE

THIS NOTE AND THE JOINT VENTURE INTO WHICH IT IS CONVERTIBLE ARE NOT SECURITIES AND HAVE NOT BEEN REGISTERED UNDER THE SECRITIES ACT OF 1933 AS AMENDED (THE "ACT"), OR UNDER THE LAWS OF ANY STATE OR OTHER JURISDICTION. THIS NOTE AND THE JOINT VENTURE MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES OR TO U.S. PERSONS (AS THAT TERM IS DEFINED IN REGULATION S UNDER THE ACT), UNLESS THEY ARE REGISTERED UNDER THE ACT AND UNDER THE LAWS OF THE STATES WHERE EACH SALE IS MADE, OR AN EXEMPTION FROM REGISTRATION REQUIREMENTS IS AVAILABLE IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY.

FOR VALUE RECEIVED, Fatima Life Plan, Inc., an Arizona corporation (the "Maker"), hereby promises to pay to Jeffrey and Marcella Ketelhut (the "Holder") at the address of 36 Pinecrest Drive, Thousand Oaks, California, 91361 the principal amount of Three Hundred Fifty Thousand and NO/100 Dollars ($350,000.00) (the "Principal"), with simple interest, paid annually at 4%, 3 year term, with an optional 4th year, from the date of this Convertible Promissory Note (the "Maturity Date"), at the interest rate specified below.

In addition to the foregoing the following terms and conditions shall apply to this Convertible Promissory Note (this "Note").

ARTICLE 1 - PAYMENT OF INTEREST AND PRINCIPAL

1.1    Accrual and Payment of Interest. Interest at the rate of four percent (4%) per annum will accrue on the Principal.

1.2    Payment of Principal. In the event that the Holder does not exercise its Conversion Privileges as provided in Section 2.1, Maker will pay to the Holder the total Principal and Interest of the Note on the Maturity.

ARTICLE 2 – CONVERSION RIGHTS

2.1    Collateral and Repayment.  In exchange for the note, the Maker of the note will issue non-voting stock in Fatima Life Plan, Inc. equivalent to a 2% ownership interest. The repayment of the $350,000.00 loan will begin thru Profit Distribution in approximately 2 years.  Immediately following the complete reimbursement of $350,000.00, this note will become complete and considered paid in full.  The holder of this note retains the 2% stock ownership and profit distribution in accordance with the guidelines established by Fatima Life Plan, Inc. and profit distribution will be distributed on an annual basis.

2.2   Liquidation Preference. In the event of any liquidation or winding up of Maker, Holder will be entitled to receive, on a pari passu basis with any other Convertible Promissory Note holders, and in preference to the holders of any equity interests in the Maker, an amount equal to the outstanding amount of this Note.

2.3   Adjustment. This Note can be converted by the Holder only in its entirety, not in part, and by the surrender of this Note at the principal office of Maker.

## ARTICLE 3 – REDEMPTION

3.1   Not Applicable

## ARTICLE 4 – EVENTS OF DEFAULT

4.1   Default. The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all principal sum remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon express, written notice and a grace period to cure such Event of Default of not less than 15 days, except as otherwise set forth below:

(a) Failure to Pay Principal. Maker fails to pay the Principal of this Note when due and such failure continues for a period of 15 days.

(b) Breach of Covenant. Maker breaches any covenant or other term or condition of this Note and such breach continues for a period of 15 days after written notice to Maker from the Holder.

## ARTICLE 5 – MISCELLANEOUS

5.1   Failure or Indulgency Not Waiver. No failure or delay on the part of either party hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. All rights and remedies existing hereunder are cumulative to, and not exclusive of any rights or remedies otherwise available.

5.2   Notices. Any notice herein required or permitted to be given shall be in writing and may be personally served and shall be deemed to be delivered upon receipt or sent by United States mail and shall be deemed to have been given one day after being deposited in the United States mail, certified, registered, with postage pre- paid and properly addressed or on receipt, or sent by fax transmission or electronic mail transmission (with the original sent by certified or registered mail or by overnight courier) and shall be deemed to have been delivered on the day telecopied or electronically transmitted.

2

5.3    Amendment Provision. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemental, then as so amended or supplemented. This Note may only be amended, modified, added to or changed by a writing executed by both Maker and the Holder.

5.4    Assignability. This Note shall be binding upon Maker and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns. The Holder may not assign this Note without the express written consent of Maker, which shall not be unreasonably withheld or delayed. Any attempted assignment in contravention hereof shall be null and void.

5.5    Cost of Collection. If an Event of Default occurs and the Holder substantially prevails in an action related to such Event of Default, Maker shall pay the Holder's reasonable attorneys' fees.

5.6    Governing Law and Venue. This Note has been executed in and shall be governed by the internal laws of the State of Arizona, without regard to the principles of conflict of laws. Venue shall only be in Pima, County Arizona.

IN WITNESS WHEREOF, Maker has caused this Note to be signed in its name as of this _31st_ day of March, 2014.

MAKER:
Fatima Life Plan, Inc.
By:
Name: _Kelly Copeland_
Title: _President_


Agreed to and Accepted by Holder:
HOLDER:
Jeffrey Ketelhut and Marcella Ketelhut

By: _____
Jeffrey Ketelhut

By: _____
Marcella Ketelhut

3

**EXHIBIT D**



NUMBER

5

INCORPORATED UNDER THE LAWS OF THE STATE OF ARIZONA

## Fatima Life Plan, Inc.

The Corporation is authorized to issue 100,000 Common Shares - Par Value $1.00 each

SHARES

2

**This Certifies that** Jeffrey A Ketelhut Marcella A Ketelhut is the owner of

2 Shares ( 2% ownership)

non-assessable Shares of the above Corporation transferable only on the
books of the Corporation by the holder hereof in person or by duly authorized
Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed
by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated April 15, 2014

SECRETARY-TREASURER

PRESIDENT